[Civ. No. 1096. Fifth Dist. Mar. 24, 1970.]

STEWART TITLE COMPANY, Plaintiff and Respondent, v.
JAMES K. HERBERT, Defendant and Appellant.

## COUNSEL

Richards, Watson & Hemmerling and James K. Herbert, Jr., for Defendant and Appellant.

Stammer, McKnight, Barnum, Bailey & Barnett and Stephen Barnett for Plaintiff and Respondent.

## OPINION

**GARGANO, J.**—Defendant is one of the founders of the Continental Title Company, hereafter referred to as Continental, and owns 350 shares of its capital stock. He appeals from a judgment of the court below, ordering him to deliver his 350 shares to the plaintiff pursuant to the terms of an option agreement between Continental and plaintiff's assignor, the Stewart Title Guaranty Company, hereafter referred to as Stewart. The sole issue centers on the court's interpretation of this option agreement.

Continental was formed in the early part of 1960; 1,500 shares of common capital stock, at a par value of $100 per share, were authorized and issued. Upon formation, Continental commenced to operate as an underwriting company, examining title to real property and selling policies of title insurance issued by Stewart; Continental retained a percentage of the fees charged.

On September 18, 1963, Continental notified Stewart of its election to

terminate the underwriting agreement under which they were operating, effective March 20, 1964. On March 19, 1964, Continental's share of the fees charged from the sale of Stewart's title insurance policies was increased and the notice of termination rescinded. In return, Continental, through its shareholders, gave Stewart an option to purchase all of Continental's shares of stock for $250,000. This agreement was prepared by Stewart and reads as follows:

"STATE OF TEXAS )
               )
County of Harris )

THIS AGREEMENT, entered into by and between STEWART TITLE GUARANTY COMPANY, a Texas corporation, herein styled "Underwriter", its successors and assigns, and the undersigned stockholders of CONTINENTAL TITLE COMPANY, a California corporation, of Fresno, California, their heirs, personal representatives, successors and assigns, herein referred to as "Stockholders",

### WITNESSETH:

Stockholders herein hereby represent that they are all of the stockholders of Continental Title Company, of Fresno, California; said stockholders, in consideration of the covenants, agreements and concessions running to stockholders, and CONTINENTAL TITLE COMPANY, a corporation, of Fresno, California, contained in agreement of even date herewith, entered into and executed by and between CONTINENTAL TITLE COMPANY and Underwriter, the receipt of all of which is hereby fully acknowledged, do hereby give and grant unto the STEWART TITLE GUARANTY COMPANY a firm option to buy all of the stock of CONTINENTAL TITLE COMPANY, a California corporation, of Fresno, California, at any time on or before June 30, 1965, for a cash consideration of Two Hundred Fifty Thousand Dollars ($250,000.00), said price to increase or decrease in an amount equal to an increase or decrease in net worth from $70,963.57, net worth figure as shown on CONTINENTAL TITLE COMPANY's December 31, 1963 audited balance sheet prepared by J. M. Cadwallader & Co., said price adjustment to be occasioned by retained earnings according to good and acceptable accounting practices, after taxes and depreciation, and not including any reappraisals of assets.

It is understood and agreed that if Underwriter elects to exercise its option hereunder, Underwriter will give notice of its intent to so do by registered United States mail, addressed to "The Chairman of the Board of the Continental Title Company" at its office address in Fresno, California, dated and postmarked not later than June 15, 1965.

EXECUTED this 19th day of March, 1964.

On June 11, 1965, Stewart notified Continental of its intention to exercise the option. However, instead of electing to purchase all of Continental's stock, Stewart elected to purchase defendant's 350 shares and John J. Sullivan's 50 shares; it offered to buy these shares at the $250,000 purchase price on a prorated basis. At the time only three of the original shareholders (defendant, John J. Sullivan and Joe R. Weirick) still owned stock in Continental.[2] The others had sold a part of their stock to Stewart and a part to a combine, hereafter referred to as "the Greiner Group." The Greiner Group and Joe R. Weirick had waived the performance by Stewart under the option agreement in respect to the shares owned by them. Defendant refused Stewart's offer, and when defendant persisted in his refusal this litigation followed.

Plaintiff admits (and the findings of fact so state) that Stewart did not, at any time during the life of its option, elect to purchase all of Continental's outstanding capital stock at the specified $250,000 purchase price. Plaintiff also admits (and the findings of fact so state) that when it offered to purchase the shares of stock belonging to defendant and Sullivan, Stewart

---

[1] Joe R. Weirick did not own the 250 shares designated after his name. 150 shares of this block were owned by Gerald B. Hill and Irene C. Hill (50 shares), Bert Irola, Jr. and Geraldine J. Irola (50 shares), and Joseph Benson Weirick (50).

[2] There is some confusion as to the Rowe stock; the record is susceptible to the interpretation that Rowe still owned 30 shares of stock when the option was first exercised; however, the court evidently found that these shares were included in the number owned by the Greiner Group.

owned only 370 shares of Continental stock in its own right; the remaining 1,130 shares were owned by defendant (350 shares), John J. Sullivan (50 shares), Joe R. Weirick and others (250 shares), and the Greiner Group (480 shares). The essence of plaintiff's contention is that Stewart had the option to purchase all or any part of Continental's stock at the overall purchase price of $250,000, and hence had separate options to purchase on a prorated basis the blocks of stock owned by each shareholder who signed the option agreement. On the other hand, defendant maintains that the individual shareholders were not obligated to sell their stock to Stewart unless Stewart was willing and able to buy all of Continental's stock. He asserts that "all" means all, not something else.

We do not believe that the option agreement lends itself to the interpretation contested for by plaintiff. It states that Stewart is given "a firm option (in the singular) to buy *all* of the stock of Continental Title Company." "All" means everyone or the whole number (*Heitman v. Commercial Bank of Savannah,* 6 Ga.App. 584 [65 S.E. 590, 597]), and it does not "admit of an exception or exclusion not specified" (*Cedar Rapids Community School Dist., Linn County* v. *City of Cedar Rapids,* 252 Iowa 205 [106 N.W.2d 655, 659]). The word "all" as defined in 1 Bouviers Law Dictionary, Third Revision, means "Completely, wholly, the whole amount, quantity or number." And, it is fundamental that words used in a contract must be understood in their "ordinary and popular sense" unless used in a technical sense or unless a special meaning is given to them by usage (Civ. Code, § 1644).

Moreover, the intention of contracting parties must be ascertained from a consideration of the entire contract (Civ. Code, § 1641), and when the use of the word "all" is viewed in light of the remaining features of the option agreement, it is clear that Continental's shareholders did not intend to give Stewart a series of separate options to purchase their stock in such quantities and at such times during the life of the option as Stewart saw fit. Stewart's notice of intention to exercise the option was to be given by registered United States mail, addressed to "The Chairman of the Board of the Continental Title Company," not to the individual shareholders. The option price was not on a per share basis; it called for a single payment of $250,000 and made no provision for the prorating of this sum among the shareholders if less than all of the stock were purchased. The $250,000 payment called for in the option was subject to readjustment, upward or downward, if an increase or decrease occurred in the net worth of the business. This latter provision alone indicates that the exercise of only one option was contemplated. It is unreasonable to believe that the shareholders intended to have the net worth of their business re-evaluated every time

Stewart decided to exercise an option to purchase a block of shares. (See Civ. Code, § 1643.)

Plaintiff points to the fact that at Stewart's request each shareholder who signed the option specified the number of his shares after the signature. It asserts that this proves that Stewart was given an option to buy all or any part of Continental's capital stock.

We are not persuaded by this argument. ■ As we have stated, the paramount consideration in the interpretation of contracts is the intention of the contracting parties, and this intention must be ascertained from a consideration of the entire contract, not some isolated portion (*Universal Sales Corp.* v. *California Press Mfg. Co.,* 20 Cal.2d 751, 760 [128 P.2d 665]; *Ghirardelli* v. *Peninsula Properties Co.,* 16 Cal.2d 494, 496 [107 P.2d 41]). We believe that when the option is viewed in its entirety, a more plausible explanation for requiring each shareholder to specify his stock ownership is that because Stewart was receiving an option to buy all of Continental's outstanding capital stock, it wished to make certain that all the shareholders had signed the agreement. ■ In any event, even if we should assume that the manner in which the option was signed by the shareholders creates an ambiguity, this ambiguity must be resolved against plaintiff because Stewart's attorney drafted the contract (*Taylor* v. *J. B. Hill Co.,* 31 Cal.2d 373 [189 P.2d 258]).

Plaintiff's remaining arguments are untenable. It argues that defendant's interpretation of the option would mean that if one shareholder breached his obligation, all other shareholders would be excused from performance because it would be impossible to have "one joint total performance." If plaintiff had lived up to its part of the bargain by offering to buy all of Continental's outstanding capital stock, it would have had a cause of action for breach of contract (and for specific performance) against any shareholder who refused to live up to the terms of the option. Plaintiff also argues that because it secured waivers from all shareholders, with the exception of defendant and John J. Sullivan, defendant and Sullivan had no cause to complain as long as they were paid their prorata share of the $250,000 purchase price. Stewart could not change the nature of its option by securing waivers from some but not all of Continental's shareholders; it could not force a few shareholders to sell their shares of stock while permitting the other shareholders to retain their shares.

■ We turn next to plaintiff's contention that "there was abundant (and preponderant) evidence to support" the trial court's interpretation of the option. ■ While ordinarily an appellate court is not bound by the interpretation given to a contract by the trial court because the interpretation is a question of law (*Moffatt* v. *Tight,* 44 Cal.App.2d 643, 648 [112

P.2d 910]), an exception is made if the interpretation turns "upon the credibility of extrinsic evidence." (*Parsons* v. *Bristol Dev. Co.,* 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) ■ Furthermore, the test of the admissibility of extrinsic evidence is not whether a contract appears to be plain on its face, but it is "whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Delta Dynamics, Inc.* v. *Arioto,* 69 Cal.2d 525, 528 [72 Cal.Rptr. 785, 446 P.2d 785].)

■ Plaintiff's references to the record do not support its bold assertion. Although there is testimony that the $65,205 tendered to defendant on June 30, 1965, was more than his stock was worth, and that defendant was instrumental in securing a sale of the Tripp stock (apparently to plaintiff) for $81 per share, and the Bergfeld stock and Rowe stock (apparently to the Greiner Group) for $122 per share, this evidence does not shed light on the nature of Stewart's option. In the same vein, testimony that all of the executives of Stewart understood that they were getting an option to buy the stock of any individual shareholder of Continental is not material. ■ There is no evidence that this understanding was communicated to Continental's shareholders before they signed the option, and it is elementary that the uncommunicated subjective belief of a contracting party is not competent evidence to prove the meaning of the contract. ■ Finally, while there is no evidence of a "one for all and all for one agreement" which would have prevented the individual shareholders who signed the option from selling their own shares of stock to Stewart if they wished to do so, the mere fact that the shareholders intended to retain the right to sell their shares to Stewart on a voluntary basis does not mean that they intended to give Stewart the unequivocal power to "gobble" them up one by one.

The judgment is reversed with directions to the trial court to enter judgment in favor of the defendant.

Stone, P. J., and Coakley, J., concurred.

A petition for a rehearing was denied April 22, 1970, and respondent's petition for a hearing by the Supreme Court was denied May 21, 1970.