[Civ. No. 1710. Fifth Dist. Aug. 6, 1974.]

MOSS DEVELOPMENT COMPANY, Plaintiff and Appellant, v. DORIS R. GEARY et al., Defendants and Respondents.

4

---

**COUNSEL**

Rodegerdts, Means, Northup & Estey and Oliver J. Northup, Jr., for Plaintiff and Appellant.

Wilke, Fleury, Sapunor & Hoffelt, Sherman C. Wilke, Paul Peek and Thomas G. Redmon for Defendants and Respondents.

## OPINION

**GARGANO, J.**—Appellant is the owner of a planned unit development in Sacramento County known as Campus Commons. A planed unit development is a subdivision project where all or some of the several owners of separate lots or parcels have the beneficial use and enjoyment of an improved area, referred to as the "common" area, consisting of recreational and similar facilities; the "common" area is owned, operated. and maintained by a non-profit corporation or association in which the lot owners are the members. (Bus. & Prof. Code, §§ 11003, 11003.1; 3 Miller & Starr, Cal. Real Estate, Subdivisions, § 848, p. 243.) Such a project is subject to section 11018.2 of the Business and Professions Code which prohibits a person from selling or leasing or offering for sale or lease any lots or parcels in a subdivision without first obtaining a public report from the Real Estate Commissioner of the State of California. It also is subject to section 11018.5 of the Business and Professions Code. This section reads in pertinent part as follows: "(2) If the . . . facilities within the common area are not completed prior to the issuance of a final subdivision public report on the project, the subdivider shall specify a reasonable date for completion and shall comply with one of the following conditions:

". . . . . . . . . . . . . . . . .

"(B) All funds from the sale of lots or parcels or such portions thereof as the commissioner shall determine are sufficient to assure construction of the improvement or improvements, shall be impounded in a neutral escrow depository acceptable to the commissioner until the improvements have been completed and all applicable lien periods have expired; provided however, the commissioner determines the time for said completion is reasonable.

". . . . . . . . . . . . . . . . .

"(D) Such other alternative plan as may be approved by the commissioner."

Appellant brought this action in the court below to secure a judicial declaration as to the meaning of certain language contained in the Declaration of Restrictions, Covenants and Architectural Control which was recorded in connection with two units of the Campus Commons development. The development contemplated several subdivision units with a total of 1,500 residential lots and a "common" area containing extensive community and recreational facilities, including a club house, swimming pools, tennis courts and a putting green; the first two units are designated as Campus Commons Unit No. 1 and No. 2, respectively, and contain 191

lots. Respondents are purchasers of lots in these units. Appellant appeals from a judgment entered on the court's order granting respondents' motion for a summary judgment.

The remaining facts, as disclosed by the record, are these:

In the latter part of 1965, appellant's predecessor, hereinafter referred to as the developer, made an application with the Real Estate Commissioner for the issuance of a public report for Unit No. 1. At that time the improvements for the "common" area were not completed, and the attorney for the developer and representatives of the Real Estate Commissioner commenced negotiations for the purpose of determining how this matter should be handled. It ultimately was decided that the developer would have 5 years, or until such time as 500 residential lots were sold, to complete the improvements specified for the "common" area and to transfer the improvements to a non-profit corporation created for the benefit of the lot owners; to assure the construction of the improvements, the developer agreed to impound the sum of $1,000 from the proceeds derived from the sale of each lot in the development and to deposit the impounded amounts in a neutral escrow. Thereupon, the developer formed a corporation by the name of Campus Commons Park Corporation, hereinafter referred to as Park Corporation, and one membership in that corporation was made appurtenant to each subdivision lot.

On January 4, 1966, the developer recorded a Declaration of Restrictions, Covenants and Architectural Control for Unit No. 1. This instrument, hereinafter referred to as the Declaration of Restrictions, states, among other things:

"DECLARATION:

"...........................................................................

"1. DESIGNATION OF AREAS. Pursuant to the map heretofore filed by Developer with respect to the real property, certain areas of the real property have been variously designated. With respect to these different areas:

"...........................................................................

"(b) Area A. This area comprising Lot A on the map shall be retained by Developer. Pursuant to provisions hereinafter set forth, it may be conveyed by Developer to Campus Commons Park Corporation, a California non profit corporation, hereinafter designated 'Park Corporation', at a future date.

"...........................................................................

"8. AREA A. It is contemplated that Developer will construct improvements on the property designated in paragraph 1(c) [sic] as Area A, which improvements are intended to provide community and/or recreational facilities for the residents of the entire [development]. It is further contemplated that Developer will create additional memberships in Park Corporation for additional lots and residential units as provided in paragraph 6 hereof and that such lots and residential units will be sold by Developer. The expenses of maintaining and operating Area A shall be borne proportionately by all owners of lots or residential units, including Developer. In addition, until Area A is conveyed to Park Corporation, Developer shall be obliged to make all payments necessary to maintain and operate Area A over and above the payments received by Park Corporation from the dues, fees and assessments levied by Park Corporation referable to the lots and residential units which have been sold. It is intended that Area A shall be conveyed to Park Corporation at some time on or before the completion of the sale of 500 lots and residential units. When 500 lots and residential units which have appurtenant memberships in Park Corporation are completely sold by Developer to individual purchasers, Developer shall, upon the completion of the sale of the 500th lot or residential unit, convey Area A free and clear of all liens and encumbrances to Park Corporation without charge. In the event that 500 of such lots and units are not completely sold prior to December 31, 1970, Developer shall refund to the members of Park Corporation the sum of $1,000.00 each. For the purposes of this paragraph, lot or residential unit shall be deemed 'completely sold' upon the receipt by Developer of the full purchase price for such lot or residential unit."

The public report for Unit No. 1 was issued on January 13, 1966. Thereafter, the developer opened an escrow with a neutral escrow company, and as lots were sold from the unit it impounded the sum of $1,000 derived from the sale of each lot and deposited the impounded amounts in the escrow.[1]

The developer did not sell 500 lots within the 5-year period allowed by the Real Estate Commissioner for the completion of the improvements specified for the "common" area. However, the developer completed the improvements and tendered conveyance of them to the Park Corporation within that period. Then respondents took the position that because the

---

[1]The same procedure was followed as to Unit No. 2 except that the preamble to Paragraph 8 of the Declaration of Restrictions, which was recorded for that unit on July 3, 1967, instead of stating "It is contemplated that Developer will construct improvements on . . . Area A . . . ." states "Developer has under construction improvements on . . . Area A . . . ."

developer did not sell 500 lots within the 5-year period, each lot owner also was entitled to a refund of $1,000. This action for declaratory relief followed.

On July 12, 1971, respondents moved for a summary judgment. The motion was supported by the declarations of respondents Hager and Nevraumont, stating in essence that before purchasing a lot each declarant had read the Declaration of Restrictions and had understood it to mean that the developer was obligated not only to convey Area A to the Park Corporation as soon as 500 lots were sold, but to refund $1,000 to each member of the corporation if 500 lots in the development were not sold prior to December 31, 1970.

On July 29, 1971, appellant also moved for a summary judgment; through the declaration of attorney Weintraub, the draftsman of the Declaration of Restrictions, and the deposition of Hoyt C. Duty, the attorney with the Department of Real Estate who approved the language of the declaration, and other documentary evidence, appellant attempted to show that Paragraph 8 of the instrument was a security arrangement complying with subparagraph (2)(B) of subdivision (a) of section 11018.5 of the Business and Professions Code, the purpose of which was to assure the construction of the improvements designated for the "common" area and that under the paragraph the developer became obligated to refund $1,000 to each member of the Park Corporation only if it failed to complete and convey the improved area to the corporation by December 31, 1970.

On September 21, 1971, the trial court entered an order granting respondents' motion for summary judgment and denying appellant's motion for summary judgment. In his memorandum of decision, the trial judge observed that there were ambiguities in the Declaration of Restrictions and that he had resolved those ambiguities in favor of respondents because appellant had drafted the instrument. He also observed that what the developer and the Real Estate Commissioner may have meant by the language used in the Declaration of Restrictions was immaterial, because that intention was not communicated to the lot purchasers. The court entered judgment accordingly, and the appeal followed.

The general rules pertaining to the interpretation of contracts may be summarized briefly.

■ The construing of a written contract is essentially a judicial function to be exercised according to generally accepted canons of interpretation so that the purpose of the instrument may be given effect. ■ As

the Supreme Court stated in *Parsons* v. *Bristol Development Co.,* 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]: "It is . . . solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence. Accordingly, 'An appellate court is not bound by a construction of the contract based solely upon the terms of the written instrument without the aid of evidence . . . where there is no conflict in the evidence . . . or a determination has been made upon incompetent evidence . . . .' "

■ In the interpretation of contracts, the paramount consideration is the intention of the contracting parties ". . . as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636; *Stewart Title Co.* v. *Herbert,* 6 Cal.App.3d 957, 963 [96 Cal.Rptr. 631].) This intention must be ascertained from the words used, after taking into consideration the entire contract and the circumstances under which it was made. (Civ. Code, §§ 1641, 1647; Code Civ. Proc., § 1860; *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.,* 69 Cal.2d 33, 38-39 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; *Universal Sales Corp.* v. *Cal. etc. Mfg. Co.,* 20 Cal.2d 751, 760-761 [128 P.2d 665].)

■ The words used in a contract must be given their ordinary meaning, unless there is evidence that the parties intended to use them in a unique sense or to give the words some different meaning. (Civ. Code, § 1644; *Stewart Title Co.* v. *Herbert, supra,* 6 Cal.App.3d 957, 962.) ■ If a contract is reasonably susceptible to more than one interpretation or if it contains latent or patent ambiguities, the court may use extrinsic evidence to clarify the uncertainties; extrinsic evidence is relevant and material to prove a meaning to which the language of an instrument is reasonably susceptible. (*Delta Dynamics, Inc.* v. *Arioto,* 69 Cal.2d 525, 528 [72 Cal.Rptr. 785, 446 P.2d 785]; *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co., supra,* 69 Cal.2d 33, 37, 40.)

■ In construing a contract, it is not a court's prerogative to alter it, to rewrite its clear terms, or to make a new contract for the parties. (*Apra* v. *Aureguy,* 55 Cal.2d 827, 830-831 [13 Cal.Rptr. 177, 361 P.2d 897]; *Barker* v. *Sherman,* 123 Cal.App.2d 810, 812 [267 P.2d 863].) Courts will not add a term to a contract about which the agreement is silent. (Code Civ. Proc., § 1858; *Jensen* v. *Traders & General Ins. Co.,* 52 Cal.2d 786, 790 [345 P.2d 1].)

■ If a contract is susceptible to more than one interpretation, and if the ambiguity is not eliminated by extrinsic evidence, the court is bound to give the contract ". . . such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect,

■■■■■■■■■■■

if it can be done without violating the intention of the parties." (Civ. Code, § 1643; *Rodriguez* v. *Barnett,* 52 Cal.2d 154, 160 [338 P.2d 907].)

■ "In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. The promissor is presumed to be such party; . . ." (Civ. Code, § 1654; see *B. L. Metcalf General Contractor, Inc.* v. *Earl Erne, Inc.,* 212 Cal.App.2d 689, 695-696 [28 Cal. Rptr. 382].)

■ We have concluded that the judgment must be reversed. The language of Paragraph 8 of the Declaration of Restrictions itself indicates that the interpretation contested for by appellant is a reasonable construction of the instrument. The paragraph is entitled "AREA A," and it is immediately evident that it pertains to the improvements contemplated for the "common" area. The first sentence announces that the improvements specified for the area are intended to provide community and/or recreational facilities for the residents of the entire development and that upon completion will be conveyed to Park Corporation. The paragraph then provides that the developer *may convey* the completed improvements to the corporation at any time prior to the sale of 500 lots and that it *shall do so* upon the sale of the 500th lot. But these clauses, standing alone, are equivocal; they do not specify a time limit for the sale of the 500 lots nor do they define, precisely, the developer's obligation as to the construction of the improvements if 500 lots are never sold in the development; it is this uncertainty which is clarified by the sentence which states, "In the event that 500 of such lots . . . are not completely sold prior to December 31, 1970, Developer shall refund to the members of Park Corporation the sum of $1,000.00 each." In other words, under Paragraph 8 the exact nature of the developer's obligation to construct and convey the improvements required for Area A is equivocal because the obligation does not mature until 500 lots are sold in the development, and it is possible that 500 lots may never be sold; the sentence in question clarifies this uncertainty by making sure that the improvements will be completed within the specified time period, thereby fulfilling a statutory mandate; subparagraph (2)(B) of subdivision (a) of section 11018.5 of the Business and Professions Code requires the specification of a date for the completion of improvements of the kind involved in this case.

When Paragraph 8 is viewed in this light, it seems clear to us that the developer's responsibility to improve Area A was not conditioned only upon the sale of 500 lots; the developer was firmly committed to improve the area within 5 years. It follows that the promise to refund $1,000 to

each lot owner was made to guarantee the construction of the improvements for the "common" area within 5 years or by the time 500 lots were sold, whichever event first occurred, and that the obligation to refund the $1,000 was discharged when appellant completed and offered to convey the completed improvements to Park Corporation within the 5-year period even though it had not sold 500 lots within that period.

Moreover, when all of the circumstances are considered, it is apparent that Paragraph 8 of the Declaration of Restrictions contemplates a security arrangement and that appellant did not become obligated to refund $1,000 to each member of the Park Corporation merely because 500 lots had not been sold by December 31, 1970. First, according to the record, the improvements designed for the "common" area were not completed when the developer applied for public reports for Units 1 and 2; under those circumstances, the Real Estate Commissioner, to insure the construction of the improvements, was empowered by subparagraph (2)(B) of subdivision (a) of section 11018.5 of the Business and Professions Code to require the developer to impound all or any part of the funds derived from the sale of the lots and to deposit the impounded funds into a neutral escrow. Next, the record reveals that the Real Estate Commissioner gave the developer five years in which to complete the improvements, and then to assure construction required the developer to impound $1,000 from the sale of each lot and to deposit the impounded amounts in a neutral escrow; arguably, it was this impounded amount that the developer was to refund to each lot owner if it did not construct the improvements specified for Area A within the time limit prescribed in Paragraph 8. Lastly, the record shows that the developer impounded $1,000 from the sale of each lot from Units 1 and 2 and deposited the impounded funds into the neutral escrow; the record also shows that the improvements were completed within the five-year period allowed by the Real Estate Commissioner and tendered to the Park Corporation within that period. Suddenly to isolate a single sentence from the entire subject matter of Paragraph 8 and declare that the paragraph contains an *irreconcilable* ambiguity which must be construed against the developer to mean that something more than a security arrangement was intended, and that the developer was obligated not only to make the costly improvements on Area A but to refund almost $200,000 if it did not sell 500 lots by December 31, 1970, is an unwarranted extension of the rule articulated in section 1654 of the Civil Code; such a declaration also would impose a penalty against the developer in contradiction of the basic principle that the law abhors forfeitures and penalties.

Finally, after the testimony of Hoyt Duty, as set forth in his deposition, is considered, it is patent that Paragraph 8 of the Declaration of Restric-

tions was intended only to be a security arrangement. After explaining all of the circumstances under which the Declaration of Restrictions was negotiated by his department, Mr. Duty said that the condition contained in Paragraph 8 was imposed by the Real Estate Commissioner as a prerequisite to the issuance of the public report to make certain that the improvements for Area A would be completed and conveyed to the Park Corporation within certain time limits as required by subparagraph (2)(B) of subdivision (a) of section 11018.5 of the Business and Professions Code, not to compel the developer to sell 500 lots within a given time period. While the deponent admitted that the language used in the paragraph was susceptible to respondents' interpretation, he stated that such an interpretation was illogical and never was intended by the negotiating parties.

It is aso patent that the testimony of Hoyt Duty was relevant and admisssible. The office of the Real Estate Commissioner is the state agency entrusted with the statutory obligation to protect the interests of purchasers of lots in subdivision developments; Paragraph 8 of the Declaration of Restrictions was negotiated by that state agency in the exercise of its statutory obligation; Mr. Duty was the attorney in charge of the negotiations, and he was the state official who approved the language contained in the instrument; Duty's testimony as to the meaning of the paragraph was consistent with the language used and with a meaning to which the language was reasonably susceptible.

Respondents do not deny that Paragraph 8 of the Declaration of Restrictions was negotiated by the office of the Real Estate Commissioner in the exercise of his statutory duty to protect prospective purchasers of lots in the proposed subdivision development. Neither can respondents deny that Hoyt Duty's testimony fully supports appellant's interpretation of the instrument. They argue that once a lot was purchased in the development, the recorded Declaration of Restrictions, by its own terms, became an integral part of the contract of sale between the developer and the lot purchaser, and this contract cannot be interpreted through the use of the extrinsic evidence in question. Respondent asserts that because they had no part in negotiating the language of Paragraph 8, they cannot be affected by the secret and undisclosed intentions of the Real Estate Commissioner and the developer as to the meaning of that paragraph.

It is true that the challenged paragraph of the Declaration of Restrictions, like any other recorded deed restriction, covenant or servitude, did not "spring into existence" until the first lot was sold in the development (*Werner* v. *Graham,* 181 Cal. 174, 183-184 [183 P. 945]; *Seaton* v. *Clifford,* 24 Cal.App.3d 46, 50 [100 Cal.Rptr. 779]); in this sense, Paragraph

8 became an integral part of each contract of sale. ▉ But, if an instrument containing a covenant running with the land is ambiguous, it is the duty of the trial court to resolve the ambiguity after taking into consideration all of the facts, circumstances and conditions surrounding its execution. (*Bramwell* v. *Kuhle,* 183 Cal.App.2d 767, 777 [6 Cal.Rptr. 839].) Albeit the secret intention of the developer is not admissible to interpret the meaning of a covenant running with land, the object of the covenant, as gleaned from the circumstances and conditions surrounding the property and the parties, must govern. (*Bass* v. *Helseth,* 116 Cal. App.2d 75, 81 [253 P.2d 525, 36 A.L.R.2d 853].) Clearly, when a deed restriction, covenant or servitude is imposed by a state agency in the exercise of a statutory duty, the objects, purposes and intentions of that agency are part of the surrounding circumstances and are relevant.

The project involved in this case is a planned unit development where the several owners of the subdivision lots were to have the beneficial use and enjoyment of a recreational area, and as we have indicated, the improvements proposed for this area were not completed when the public report was issued; it was to insure completion of the improvements and to protect prospective lot purchasers that the covenant in question was exacted by the Real Estate Commissioner. To ignore the totality of the circumstances and to hold that the testimony of the state official who negotiated the very covenant upon which respondents rely for the proposition that they are entitled to a refund of $1,000 each, is not admissible to explain a patent ambiguity and then to declare categorically that the language used in the instrument must be construed strictly against the developer, even though a strict construction would result in a forfeiture of almost $200,000, would be contrary to elementary principles of justice and would set a precedent which could lead to harsh and absurd results. Certainly, if Mr. Duty's testimony had supported respondents' position, they would not be arguing now that his testimony was immaterial; in fact, respondents rely on portions of the public official's testimony to support their own interpretation.

It is one thing to state that the secret intentions of a land developer are inadmissible to interpret the meaning of a deed restriction, covenant or servitude once lots have been sold in the subdivision; it is another matter entirely to decree that the testimony of the state official who negotiated and then approved the language of such a covenant in the exercise of his statutory duty to protect prospective purchasers may be utilized to explain patent ambiguities even though the covenant has become an integral part of a contract between the developer and the purchaser of a lot within the development where, as here, the testimony is consistent with the language

used and with the objects and purposes for which the covenant was imposed by that agency.

The cases of *Oakland Bank of Commerce* v. *Washington,* 6 Cal.App.3d 793 [86 Cal.Rptr. 276], and *Houghton* v. *Kerr Glass Mfg. Corp.,* 261 Cal.App.2d 530 [68 Cal.Rptr. 43], upon which respondents rely for the opposite proposition are distinguishable; in each case one of the negotiating parties to a bilateral contract had failed to disclose his secret intention to the other negotiating party, and the court applied the well-settled principle of contract law that the intention of a party to a bilateral contract which is undisclosed and uncommunicated to the other is, in the absence of mistake or fraud, immaterial. For example, in the *Oakland Bank* case the defendants had guaranteed loans made by the plaintiff bank to a third party, and the defendants wanted to show that they did not intend the guarantee to extend to loans made prior to the execution of the guarantee. In *Houghton,* the agent of the defendant negotiated a contract with the plaintiff in which the plaintiff was to be paid $20,000 upon the termination of his employment with the defendant. The defendant tried to prove that its agent had been told that the defendant was to be relieved of the obligation if the assets of the corporation were sold.

Respondents suggest that the last sentence of Paragraph 8 of the Declaration of Restrictions must be construed as a separate promise on the part of the developer to sell 500 lots in the Campus Commons development by December 31, 1970, because the owners of lots in Units 1 and 2 had a real interest in the speed with which the developer sold the lots in other units. Respondents argue that this is so because the initial assessments for the operation and maintenance of Area A were to be spread over the 191 lots contained in Units 1 and 2 until lots in other units were sold; they allege that as the total number of lots sold increased ". . . the prorata assessment to each member of Park Corporation would become relatively lower."

Obviously, the purchasers of lots in Units 1 and 2 had an interest in the speed with which the developer sold 500 lots in the Campus Commons development. This factor alone does not alter the developer's agreement, nor does it change the security arrangement set forth in Paragraph 8 to something more. Absent evidence to the contrary, respondents' assertion that the next to the last sentence of Paragraph 8 is in the nature of a penalty clause to compel the developer to sell 500 lots as expediently as possible is speculation.

We do not believe that the developer's obligation to contribute toward the cost of operation and maintenance of Area A after the area is conveyed to the Park Corporation necessarily is limited to unsold lots in

Units 1 and 2. The agreement states that "[t]he expenses of maintaining and operating Area A shall be borne proportionately by all owners of lots or residential units, including Developer." Because the improvements specified for Area A were for the benefit of the entire development, and because the developer's obligation to contribute toward the maintenance and operation of that area is not limited expressly to unsold lots in Units 1 and 2, arguably the amount of the developer's contribution is determined on the basis of all unsold lots, including unsold lots in other units. In fact, when the language of the agreement is considered in conjunction with the public report which was issued by the Real Estate Commissioner, it even may be argued that the developer's share of the operation and maintenance costs is calculated on the basis of 500 lots. This question was not presented adequately in the court below, and we do not reach it in this opinion.

If this were an appeal from a trial on the merits, we would reverse the judgment with directions to the trial court to enter judgment in favor of appellant under the well-established rule that "[i]t is . . . solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence." (*Parsons* v. *Bristol Development Co., supra,* 62 Cal.2d 861, 865.) This is an appeal from a judgment entered on the court's order granting respondents' motion for a summary judgment. It is conceivable that respondents can produce evidence in support of their interpretation of the contract other than their conclusionary statements as to what they understood the contract to mean. It also is conceivable that evidence can be produced by the parties as to the extent of appellant's obligation to contribute toward the maintenance and operation of the improvements for Area A once those improvements are conveyed to the corporation.

The judgment is reversed, and the cause is remanded for further disposition in accordance with the issues raised by the pleadings now on file in the court below or any appropriate amendment thereto.

Brown (G. A.), P. J., and Franson, J., concurred.

A petition for a rehearing was denied September 5, 1974, and respondents' petition for a hearing by the Supreme Court was denied October 2, 1974. Mosk, J., was of the opinion that the petition should be granted.