[No. E010836. Fourth Dist., Div. Two. Apr. 6, 1994.]

HI-DESERT COUNTY WATER DISTRICT, Plaintiff and Respondent, v. BLUE SKIES COUNTRY CLUB, INC., Defendant and Appellant.

■■■■■■■■■■■■■
■■■■■■■■■

■■■■■■■■■■■■■■■■■

**COUNSEL**

Best, Best & Krieger, Gregory K. Wilkinson and Ginevra C. Marum for Defendant and Appellant.

Brunick, Alvarez & Battersby, James W. Anderson and Steven M. Kennedy for Plaintiff and Respondent.

Susan M. Trager and Michele A. Staples as Amicus Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**McDANIEL, J.***—Blue Skies Country Club, Inc. (defendant), has appealed from a postjudgment order which purported to interpret the provisions of a stipulated judgment entered into in 1977 (hereinafter, the 1977 judgment), which delineated the respective rights of defendant and Hi-Desert County Water District (the District) in the water of the Warren Valley Basin. Such interpretation operated to impose the financing scheme, later advanced by the watermaster, under a so-called physical solution to the water shortage problem. We note in passing that the District is the watermaster which made the proposal adopted by the trial court.

■■■■ Defendant correctly contends that the 1977 judgment finally adjudicated the rights of defendant as a overlying user *with a prior right to 585 acre-feet per year.* Thus, we hold that the order appealed from, which declared that all of the parties have rights *which are equal in priority* and that the watermaster may assess all users for water extractions above a party's pro rata share of the basin's supply, had the effect of *improperly redefining* the rights to the basin's water in contravention of the 1977 judgment. We shall reverse the judgment accordingly.

### FACTUAL AND PROCEDURAL SYNOPSIS

The Warren Valley Basin (the basin) underlies the community of Yucca Valley in the area of San Bernardino County commonly known as the high

---

*Retired Associate Justice of the Court of Appeal, Fourth Distict, senior judge status (Gov. Code, § 75028.1), sitting under assignment by the Chairperson of the Judicial Council.

desert. It is bounded on the north by the San Bernardino Mountains and Pinto Mountain Fault, and on the south by the Little San Bernardino Mountains. It lies between a zone of transition to the Joshua Tree Sub-basin to the east, and a natural topographic feature to the west. The basin is capable of storing approximately 160,000 acre-feet of groundwater and constitutes the sole water supply for the area. Precipitation and runoff from a limited watershed are the basin's only sources for recharging groundwater to the basin. Because such precipitation is cyclic and no supplemental water was available, and because the population had begun to grow, geologists hypothesized, probably as early as 1965, that extractions from the basin exceeded supply. Continued unchecked, this overdraft would eventually deplete the basin.

The following parties extract water from the basin and claim rights to its supply: 1) defendant, a corporation, which owns and operates a golf course on lands overlying the basin and which has been extracting water since 1956 to irrigate them; 2) the District, a county water district formed in 1962 and created from the consolidation of several privately owned water companies, pursuant to Water Code section 30000 et seq., to provide water for domestic consumption to an area which includes a portion of the basin; 3) the Yucca Water Co., Ltd. (the Utility), a water provider (since purchased by the District and for purposes of this appeal, the utility's interests are identical to the District's); 4) the Institute of Mental Physics, which pumps water from the so-called zone of transmission; and 5) 16 other landowners whose properties overlie the basin.[1] With the exception of the Institute of Mental Physics and defendant, all of the pumpers extract water from the basin for domestic and municipal purposes only. Otherwise, there is no commercial, agricultural or industrial use of the basin's water.

The continued overdraft and threat to the future existence of the basin's water supply prompted the District in 1976 to file a complaint against: 1) defendant; 2) the Utility; 3) the Institute of Mental Physics; and 4) the 16 overlying landowners, seeking an adjudication of the parties' water rights. After the case was at issue, the parties entered into extensive negotiations. As a result of these negotiations, a stipulation, signed by all of the parties, was entered into. Such stipulation was introduced at trial in 1977, was approved by the trial court and provided the basis for the 1977 judgment.

## A.  *The Judgment*

Reflecting the stipulation noted, the 1977 judgment first declares, in part A, entitled the "Hydrologic Circumstances," despite the paucity of data, the

---

[1] The zone of transmission is a subsurface area between two basins where the water naturally flows from one basin into another.

basin's native safe yield, i.e., "[t]he long-term average annual net native supply of water to the Basin under cultural conditions of a particular year," to be estimated at 200 acre-feet per year (af/yr). Recognizing that "[p]resent net consumptive use of Basin waters exceeds substantially said Native Safe Yield . . . ," the 1977 judgment continues, "[s]upplemental water will, accordingly, be required to meet water demands of the Basin in future years."

Paragraph 9 thereof states, "*Prescription.* The taking of water by the parties hereto has been open, notorious, continuous, hostile, adverse and under claim of right for more than five years prior to the filing of the complaint herein. Said condition of overdraft of [the] Basin has been a matter of common knowledge and all parties and overlying property owners have had notice of said condition during said period of years."

Part B is entitled "Water Rights." Paragraph 11 thereof provides for "*Overlying Rights.* The following parties own lands overlying [the] Basin. By reason of production of water from the Basin during the period 1970-1975, each of said parties has preserved by self help the overlying right to produce up to the quantity of water herein set forth:

| "Name | Overlying Right | Nature of Use |
|---|---|---|
| "Blue Skies | 585 acre feet/year | Golf Course. . . ." |

The remaining 16 pumpers also have overlying rights, but because they extract no more than 1 af/yr, they are "minimal pumpers" and are not parties to this appeal.

Paragraph 11(a) provides, "*Self Help.* By reason of the prescriptive circumstances found in Paragraph 9 hereof, said overlying rights have been prescripted and *are thereby limited to the extent of such maximum annual self help by production during the prescriptive period. Said rights remain overlying in character,* and as such may only be exercised except for reasonable overlying uses on the lands now owned by said parties." (Italics added.)

Paragraph 11(b) then adds, "*Prescription Against Unused Overlying Rights.* By reason of said prescriptive circumstances, all unexercised overlying rights have been lost and extinguished and no new overlying production may be commenced, so long as [the] Basin remains in a state of overdraft."

Paragraph 12 states, "*Appropriative Rights.* Appropriative rights to the waters of [the] Basin have been perfected by District and Utility. By

stipulation of said parties, said appropriative rights shall be deemed, and are hereby decreed, to be of equal priority. Said appropriative rights are exempt from prescription by reason of Section 1007 of the . . . Civil Code. The respective quantities of said rights are as follows:

| "Name | Appropriative Right |
|---|---|
| "District | 896 acre feet/year |
| "Utility | 726 acre feet/year"[2] |

Total adjudicated rights in the basin water amount to 2,303 af/yr. The 1977 judgment enjoins all parties from producing water from the basin "except pursuant to the rights [therein] decreed" or pursuant to a physical solution which would later be adopted under the judgment.

The 1977 judgment next provides, in section VI, "Physical Solution," that "[i]n order that the Court may assure maximum beneficial use of the water resources of [the] Basin in accordance with Section 2 of Article X of the California Constitution," the District would act as watermaster to devise a physical solution to the overdraft problem and to administer the judgment.

The physical solution portion of the judgment is merely a statement of intent, establishing in paragraph 17(a) that *"Safe Yield Operations Are Inappropriate"* because restricting production to the safe yield would frustrate development and use of resources, and so the overlying economy required "controlled mining" of water in storage. The need for supplemental water is announced in paragraph 17(b) and the *"Need for Funding"* is addressed in paragraph 17(c). Jurisdiction over the issue was reserved to the court.

Pursuant to the 1977 judgment, the court made findings of fact and conclusions of law (the conclusions). With the exception of "minor, immaterial variances," such findings are reflected by the judgment and, in particular, paragraphs 9, 11, and 12 thereof.

### B. *Events After the 1977 Judgment*

While the watermaster worked to develop a physical solution, a system of controlled mining was implemented. Funding the watermaster's work and

---

[2] At paragraph 13, the Institute of Mental Physics was adjudged to be producing no more than 80 af/yr and could continue producing that amount without incurring financial liability. To the extent that the Institute's production exceeded 80 af/yr, it would be subject to the physical solution imposed by the judgment. It did not file an appeal from the postjudgment order here under review.

importation of supplemental water quickly became points of concern. Recognizing that "[t]he ultimate . . . goal is to obtain outside water and bring it to the basin . . . ," in 1984, the court approved a proposed budget which authorized the watermaster to levy a two-tiered production assessment to pay for ongoing activities. Such levy was tied into the judgment by allowing the parties to pay a flat fee to pump up to the "established production rights," and then pay a higher rate per acre-foot of withdrawal in excess of the party's adjudicated allotment.

In May 1991, the watermaster issued a "Final Summary Report" of its "Warren Valley Basin Management Plan" (the management plan). In the recommended management plan portion of the report, the watermaster proposed importing supplemental water from the state water project via the proposed Morongo Basin Pipeline, a $66.5 million project consisting of a 71-mile pipeline.[3]

To finance its activities, the watermaster analyzed proposed funding options: First, because it was inadequate, the watermaster suggested abolishing the two-tiered production assessment in favor of uniformly assessing all withdrawals. Second, to pay for the $6,861,137 for the local Morongo Basin Pipeline and related infrastructure, built to resupply water taken in excess of safe yield, the watermaster proposed a replenishment assessment. Based on a delivery of 7,250 af/yr, the watermaster urged a replenishment assessment of "$1,009 per acre-foot for each acre-foot of extracted groundwater *beyond the safe yield allocation*," rather than beyond the adjudicated allotment. (Italics added.) Under this proposal, rather than paying for each acre-foot over 585 af/yr, defendant would be required to pay for each acre-foot that exceeded the proportion that defendant's adjudicated right bears to all adjudicated rights, or $1,009 for each acre-foot over 26 percent of the safe yield. Two alternative approaches to the replenishment assessment were also mentioned but not adopted.[4] The court reviewed the plan and approved the watermaster's proposal and the uniform production assessment.

---

[3]The previous year, the voters had approved a financing plan for the Morongo Basin Pipeline.

[4]Such alternatives were: 1) the District would fund the capital cost of the Morongo Basin pipeline and water users would be liable for the $3,510,500 to operate and manage the pipeline, plus the $63 for pumping, with a consequential replenishment assessment of only $547 af/yr. This option would obligate the District to bear the burden of paying what property taxes would not; or 2) users would be assessed only for the direct costs of the recharged water, and collection of assessments for transporting the water would be deferred until the Morongo Basin Pipeline was complete. This would have the effect of reducing assessments until after 1995. *This last option is the one most often employed.*

## C. *The Current Action*

Prompted by the watermaster's proposal that the replenishment assessment apply to extractions above the safe yield rather than above the adjudicated rights, on November 26, 1991, defendant moved for an order amending the declaration of safe yield contained in the judgment. At issue was the nature and extent of the water rights adjudicated under the 1977 judgment.

By order dated February 10, 1992 (the 1992 order), the court issued a temporary order deeming the safe yield of the basin to be 900 af/yr effective July 1, 1991. Based on such safe yield, the court issued its "Determination Of Rights In Safe Yield (Perennial Yield)" as follows: "There are three groups of rights, all of which are prescriptive in nature and *are of equal priority*. Such rights are: (1) the overlying rights of owners of land overlying the basin; (2) the appropriative rights of District and Utility (hereafter jointly 'District'); and (3) the rights of the Institute of MentalPhysics [*sic*]. [¶] *The quantitative rights* of each of these groups are confirmed in the Judgment at Paragraphs 11[, 12,] and 13. *The court confirms these rights and determines that, by reason of their equal priority, each has a proportionate right in the Safe Yield as hereinabove set forth.*" (Italics added.) The net result of such order was to curtail defendant's unconditional right to 585 af/yr by requiring it to pay $1,009 for every acre-foot pumped over 26 percent of the safe yield, or 234 af/yr. Defendant's appeal followed.

### DISCUSSION

In this appeal, defendant contends that the 1992 order, here under review, operated to redefine the parties' respective rights in contravention of both the 1977 judgment and California water law.[5] In defendant's view, the judgment defined defendant's water rights as those of an overlying owner/user, subject to the District's prescription, but that by virtue of its self help, it is defendant's further view that it remained entitled to 585 af/yr, prior to any rights that the District has *as an appropriator*. The District argues that the trial court correctly ruled that all parties have equal priority to the water by virtue of the prescription described in the judgment and that defendant must pay for extractions over 26 percent of the safe yield. As our analysis reveals, the authorities support defendant's position and refute the District's.

■ Under California law, "[p]roper overlying use, . . . is paramount, and the right of an appropriator, being limited to the amount of the surplus,

---

[5]Defendant does not challenge the safe yield determination or the court's retention of jurisdiction to reconsider the safe yield in the future.

must yield to that of the overlying owner in the event of a shortage *unless the appropriator has gained prescriptive rights through the taking of nonsurplus waters.*" (*City of Pasadena* v. *City of Alhambra* (1949) 33 Cal.2d 908, 926 [207 P.2d 17] [*Pasadena*], italics added.)[6] In *Pasadena*, extractors had been adversely taking nonsurplus groundwater for more than 20 years, thereby creating a condition of overdraft. The court illustrated the nature of prescriptive rights in groundwater in which adverse users do not completely oust owners of their rights. Both parties continue to pump, creating an overdraft and interfering with everyone's ability to pump in the future. (33 Cal.2d at pp. 931-932.)

In determining the rights of the parties when all have continued to pump nonsurplus water for more than the statutory period without seeking aid of the courts, the court explained, "at first glance it would seem to follow that the parties who wrongfully appropriated water for a period of five years would acquire prior prescriptive rights to the full amount so taken." However, the court concluded, "[t]he running of the statute . . . can effectively be *interrupted by self help on the part of the lawful owner of the property right involved* . . . . The original owners by their own acts, although not by judicial assistance, thus retained or acquired a right to continue to take some water in the future. The wrongdoers also acquired prescriptive rights to continue to take water, but their rights were *limited to the extent that the original owners retained or acquired rights by their pumping.*" (*Pasadena, supra,* 33 Cal.2d 908, 931-932, italics added.) Hence, an overlying user may maintain rights to water by continuing to extract it in the face of an adverse appropriative use. Such is the doctrine of "self help."

Left unresolved in *Pasadena,* however, was whether by continuing to pump, an overlying user *in an overdrafted basin* retained its original overlying rights or obtained new ones by prescription. (Schneider, Groundwater Rights in California, Background and Issues (Governor's Com. to Review Cal. Water Rights Law, Staff Paper No. 2, July 1977), p. 10 [Staff Paper No. 2], fn. omitted, italics added, citing *Pasadena, supra,* 33 Cal.2d 908, 932.) In 1975, in its most comprehensive statement of water law, our Supreme Court in *City of Los Angeles* v. *City of San Fernando* (1975) 14 Cal.3d 199 [123 Cal.Rptr. 1, 537 P.2d 1250] (*San Fernando*), finally clarified the proposition that overlying owners "*retain their rights by using them.*" (Staff Paper No. 2, *supra,* p. 10, fn. omitted, italics added.)

---

[6]Historically, "[a]n overlying water right . . . is the right to take water from the ground underneath the land for use on the land." (*Tehachapi-Cummings County Water Dist.* v. *Armstrong* (1975) 49 Cal.App.3d 992, 1001 [122 Cal.Rptr. 918].) "Appropriation is the use of water for nonoverlying purposes such as exportation to lands outside the basin or for municipal use within the basin." (*Id.* at p. 1000, fn. 6.)

The *San Fernando* court analyzed at length the rights of various overlying, appropriative and prescriptive users in the waters circulating into and under-lying the Upper Los Angeles River Area. The Supreme Court remanded to the trial court the task of adjudicating the rights to the Sylmar Basin, doing so after explaining possible facts which might be proven below. Among those were, "3. The private defendants may show overlying rights to native ground water for reasonable beneficial uses on their overlying land, subject to any prescriptive rights of another party." (14 Cal.3d 199, 293, fn. omitted.) The court added, "Even though cities cannot *lose* their water rights by prescription,[7] their *acquisition* of prescriptive ground water rights is *subject to the limitations stemming from the lawful owners's self help* set forth in *City of Pasadena* v. *City of Alhambra, supra,* 33 Cal.2d at pp. 931-933." (*San Fernando, supra,* 14 Cal.3d 199, 293, fn. 101, first two italics in original, third italics added.) The point was driven home when the Supreme Court applied the preceding principles for establishing the rights of the parties to the water, declaring "(2) *Private defendants should be awarded the full amount of their overlying rights, less any amounts of such rights lost by prescription,* from the . . . native groundwater." (*Id.* at p. 294, italics added.) That is, overlying users retain priority but lose amounts not pumped.

■ Turning to the 1977 judgment, preliminarily, no one in this case disputes that that judgment, entered into after extensive negotiations and approved by the court, is tantamount to a contract. (See *Pardee Construction Co.* v. *City of Camarillo* (1984) 37 Cal.3d 465, 471 [208 Cal.Rptr. 228, 690 P.2d 701].) As such, it is subject to "interpretation and construction." (*Ibid.*; see *Pasadena, supra,* 33 Cal.2d 908 [only considering water rights of nonsignatory to stipulation].) That judgment finally governs the parties' rights to the basin's water 16 years later.

In that judgment, part B, which defines the parties' water rights, in our view, conforms to *Pasadena* as explained by *San Fernando*. Paragraph 11 provides, defendant has "*preserved* by self help the *overlying right to pro-duce up to the quantity* of water herein set forth: [¶] . . . 585 [af/yr]. . . ." (Italics added.) Paragraph 11(a) then reinforces the proposition that defend-ant protected by self help its rights to a specific quantity: "overlying rights have been prescripted and are thereby *limited to the extent of such* maximum *annual self help by production* during the prescriptive period. . . ." The District's rights were not enunciated until paragraph 12 in which it is

[7]Civil Code section 1007 prevents taking title by prescription of water rights held by public entities: ". . . no possession by any person, . . no matter how long continued of any . . . water right, . . . dedicated to a public use by a public utility, . . . shall ever ripen into any title, interest or right against the owner thereof."

described as having "appropriative rights" to 1622 af/yr. Defendant's priority is perpetuated by use of the phrases "overlying right" and defendants' "rights remain overlying in character" in paragraph 11 versus "appropriative rights" in paragraph 12 of the judgment.[8]

That the parties here intended that defendant would and could protect its quantity and priority by self help is confirmed, not only by the fact that the judgment was executed just two years after the pronouncements in *San Fernando*,[9] but also by the trial court's legal conclusions in 1977, reiterating paragraph 11(a): "By reason of the prescriptive nature of the rights declared in the Findings of Fact, these overlying *rights have been prescripted except to the extent of* such maximum *annual self help by production* during the prescriptive period. Said rights remain overlying in character. . . ." (Italics added.) Otherwise, as defendant has observed, it certainly would not have stipulated to an adjudication which eviscerated all of its priority.

In light of the authorities discussed and based on our interpretation of the judgment, the 1992 order, which provided that the parties' rights are all prescriptive and of "*equal priority*" and "by reason of *their equal priority, [that] each has a proportionate right in the Safe Yield*," (italics added) represents an improper redefinition of the rights of the parties. The 1992 order dismisses the specific rights decreed in the judgment as "overlying" and "appropriative" and ignores the acre-foot amount *specifically allocated to each of the overlying owners and the District*. As such, the District's and

---

[8]According to paragraph 11(b), "all *unexercised* overlying rights have been lost and extinguished, . . ." (Italics added.) The District argues that paragraph 11(b) does not state that *only* unexercised overlying rights have been lost by prescription, because the District has also taken by prescription some of defendant's exercised rights. We agree to the extent that the District has prescriptively taken certain of defendant's exercised rights leaving to defendant 585 af/yr. In other words, we read "unexercised rights" to mean amounts not pumped, so that defendant may never increase the amounts to which it has prior right. Defendant has lost its unused rights for which the need had not yet come into existence during the prescriptive period, i.e., amounts it could have pumped in the future, but not its priority.

[9]The District quotes a portion of the opinion in *San Fernando* in which the court seems to suggest that by pumping any time during the prescriptive period an overlying owner retains merely a proportionate share of the safe yield (Staff Paper No. 2, *supra*, at p. 10): "The effect of the prescriptive right would be to give to the party acquiring it and take away from the private defendant against whom it was acquired either (1) enough water to make the ratio of the prescriptive right to the remaining rights of the private defendant as favorable to the former in time of subsequent shortage as it was throughout the prescriptive period [citation] or (2) the amount of the prescriptive taking, whichever is less [citation]." (*San Fernando, supra*, 14 Cal.3d 199, 293, fn. omitted, citing *Pasadena, supra*, 33 Cal.2d 908, 931-933.) Nevertheless, after stating this equation, the court specifically stated that the overlying owner would retain from the native groundwater all but amounts lost by prescription, while the rest of the available supply would be allocated among holders of appropriative and prescriptive rights. (*Id.* at p. 294.)

the trial court's interpretation violates the "cardinal rule of construction that a contract is to be construed as a whole, effecting harmony among and giving meaning to all the parts thereof." (*People* ex rel. *Dept. of Parks and Recreation* v. *West-A-Rama, Inc.* (1973) 35 Cal.App.3d 786, 793 [111 Cal.Rptr. 197], citing Civ. Code, § 1641.)[10]

In arguing that the 1992 order should be sustained, the District relies on *Pasadena*, which required a proportionate reduction of the water use by all parties, regardless of their legal priority. The issue in *Pasadena* was who "shall bear the burden of curtailing the overdraft, . . ." (*Pasadena, supra*, 33 Cal.2d 908, 925.) Because everyone had been drawing down the basin's supply for far longer than the statutory period, the court instituted the doctrine of mutual prescription, requiring all parties to reduce their use by an amount in proportion to the share of the water each party had been extracting during the statutory period. (*Id.* at p. 933.) Yet, *San Fernando* rejected mechanical application of the doctrine of mutual prescription, among other reasons, because it "does not necessarily result in the most equitable apportionment of water according to need." (*San Fernando, supra*, 14 Cal.3d 199, 265.)[11]

Further, *Pasadena* is distinguishable on its facts. There, some appropriators had commenced extractions *after* the overdraft had begun with the result that a reduction on the basis of strict priority would have caused an elimination of newer prescriptive users. (33 Cal.2d 980, 933; see *San Fernando, supra*, 14 Cal.3d 199, 266.) Here, as in *San Fernando*, none of the parties began extractions after the safe yield was exceeded, and so none is threatened with complete elimination were the strict priority method used. (14

---

[10]The District also argues that defendant's use of its water to irrigate a golf course is unreasonable in contravention of the constitutional mandate (Cal. Const. art. X, § 2), and so we should uphold the trial court interpretation of the judgment which severely limits defendant's water rights. This was argued to the trial court which ruled "the issue of unreasonable use raised by the District, [is] not yet ripe for adjudication and the Court declines to rule on any such other issues not herein addressed for said reason." We may not consider them on appeal.

Nor is the public trust doctrine applicable. (*Santa Clarita Water Co.* v. *Lyons* (1984) 161 Cal.App.3d 450, 462 [207 Cal.Rptr. 698].) "There is substantial reason to conclude that the public trust doctrine does not extend to nonnavigable streams to the extent they do not affect navigable waters." (*Golden Feather Community Assn.* v. *Thermalito Irrigation Dist.* (1989) 209 Cal.App.3d 1276, 1284 [257 Cal.Rptr. 836].)

[11]The District also relies on *California Water Service Co.* v. *Edward Sidebotham & Son* (1964) 224 Cal.App.2d 715 [37 Cal.Rptr. 1], which in turn cited *Pasadena*, to argue that proportionate reductions in water use is the preferred method of protecting a basin in overdraft. But, that case was succeeded by *San Fernando* which declared that "[a] true equitable apportionment would take into account many more factors" than simply the amount the parties pumped during the prescriptive period. (14 Cal.3d at p. 265.)

Cal.3d at p. 266.) Thus, the doctrine of mutual prescription is not needed here to achieve the purposes desired in *Pasadena*. In fact, were the proportionate share system implemented, defendant may be forced to shut down as the result of the high cost of the replenishment assessment. Unlike *Pasadena*, the judgment here had as its object, not to relieve the overdraft so much as to allocate rights and plan for financing the cost of supplemental water. The physical solution part of the judgment, paragraph 17, entitled, "(a) *Safe Yield Operations Are Inappropriate*" specifically determined *not* to restrict pumping to the basin's native safe yield. After allocating to defendant the absolute prior right to 585 af/yr in part B, paragraph 17 established that the parties would engage in "controlled mining of such water in storage" until supplemental water became economically feasible. Hence, *limiting the parties' water use to the safe yield was never the goal* of the 1977 judgment, and so the trial court's implied reliance on the mutual prescription doctrine and on the pro tanto reduction of water use in *Pasadena* was error.

The District points to the prescriptive circumstance delineated in paragraph 9 to contend that the 1992 order correctly declared that all of the parties have equal priority to the water, and that "the effect of [defendant's] self-help during the prescriptive period is only to preserve [defendant's] right to continue to produce its proportionate share of the safe yield of the basin." Such interpretation palpably distorts the judgment's language. Paragraph 9, located *not in the portion of the judgment outlining the parties' rights to the basin's water but in Part A, entitled "Hydrologic Circumstances,"* which defines the fact of overdraft, simply states that the elements of prescriptive rights have been met. By contrast, water rights are separately set out in part B, paragraphs 11 through 13. Had the parties intended that the respective rights have equal priority, they could have said exactly that, as they did when defining the rights of the District and Utility in paragraph 12, moreover, logically, they would have included paragraph 9 in the water rights section of the judgment. Instead, long paragraphs were drafted allocating to each party specific rights to precise amounts and utilizing such words as "overlying" and "appropriative." Turning again to applicable authority, "[i]n construing a contract, it is not a court's prerogative to alter it, to rewrite its clear terms, or to make a new contract for the parties." (*Moss Dev. Co.* v. *Geary* (1974) 41 Cal.App.3d 1, 9 [115 Cal.Rptr. 736].) We decline to read paragraph 9 as having an effect on the parties' priorities as defined in another section of the judgment.

Nor is the District really in a position to dispute our conclusions. Its complaint alleged, "[t]he *overlying rights* of Defendant . . . have been preserved by *self-help to the extent of production* by said parties during the

five year period prior to filing of this action . . . . *Said rights remain overlying in character, but are limited in quantity by said prescriptive* circumstances." (Italics added.) Further, at the hearing from which the disputed order derived, the watermaster's attorney even agreed that paragraph 11 recognized "*the self-help of the parties preserved their overlying right to produce up to that quantity* of water . . . ." (Italics added.) Such allegations and admissions correspond precisely to defendant's interpretation of the judgment, with which we agree.

Not only has the District's averments compromised its position, but so have its actions. ■ The "conduct of the parties after execution of the contract and before any controversy has arisen as to its effect" is given " 'great weight' " because such conduct "affords the most reliable evidence of the parties' intentions." (*Kennecott Corp.* v. *Union Oil Co.* (1987) 196 Cal.App.3d 1179, 1189 [242 Cal.Rptr. 403].) The original production assessment suggested by the watermaster (which, as noted, is the District), approved by the court in 1984, reflected defendant's interpretation of the judgment. Under that tax structure, only if defendant used water above 585 af/yr was it subject to the higher levy.[12]

After all is said and done in the legal arena, it is apparent that money is the real issue here: who must pay for the cost of importing water to replenish amounts taken in excess of the safe yield. Defendant claims it may pump 585 af/yr before being liable for the cost to replenish the basin. According to the District, the 1992 order correctly charges defendant for extractions above its pro rata share of 26 percent of all extractions. With the safe yield at 900 af/yr, in practical terms this means defendant would be able to take only 234 af/yr before incurring $1,009 for each additional acre-foot, translating into a cost of $354,159 more than the 1977 judgment contemplated.

The general purpose of a physical solution "is to avoid a waste of water *without unreasonably or adversely affecting the rights of the parties.*" (*San Fernando, supra,* 14 Cal.3d 199, 290, italics added.) Accordingly, the judgment directed the watermaster to devise a physical solution and "to administer and *enforce the provisions of this Judgment* and any subsequent instructions or orders of the Court *hereunder.*" (Italics added.) The judgment stated

---

[12]The District finally argues that defendant's reading of the judgment amounts to a taking of the District's water rights in violation of Civil Code section 1007 which immunizes the property of cities and public entities against acquisition of prescriptive rights by private parties. (Civ. Code, § 1007.) However, our decision does not limit or reduce the amount of water to which the District is entitled. It was the District who stipulated in 1977 to the allocation of water and that it too would be limited to a specific amount. That amount remains.

in paragraph 17(c), "*Need for Funding*," that supplemental-water "[d]elivery facilities will require . . . *most of all*, financial arrangements within the capacity of the landowners and water users of [the] Basin. *The economy which is built during the period of controlled mining of said basin must ultimately be committed to payment of such supplemental water costs*." (Italics added.) The judgment intended to *allocate financial liability* for supplemental water to latecomers to the area, not to defendant. By attempting to restructure the production assessment and to assess defendant for replacing those of defendant's extractions which exceed its pro rata share of the safe yield, the watermaster palpably ignored the rights of defendant as defined in the 1977 stipulated judgment. More particularly, such restructuring represented an effort to extract money from defendant to pay for the supplemental water in direct violation of the terms of such judgment.

While we are mindful of the constitutional mandate to protect the parties' rights in a manner that minimizes waste while maximizing beneficial use of the water in controversy (Cal. Const., art. X, § 2), the physical solution reflects such conserving principles and the various conservation methods described in the physical solution report do not present an issue here. The watermaster is capable of devising an assessment method which does not violate the priorities set forth in the judgment; two such alternatives to the replenishment assessment eventually chosen were considered. Our holding is limited to the facts of this case and to the circumstances here presented. The trial court properly retained jurisdiction to meet future problems brought about by changing conditions. ▄▄ Inasmuch as the 1992 order will require defendant to pay for water by means of assessments on its extractions above its proportionate share, we hold that the physical solution illegally impinges on defendant's adjudicated prior right to 585 af/yr by improperly redefining defendant's obligations with regard to its use of the basin's water.

DISPOSITION

The order appealed from is reversed.

Dabney, Acting P. J., and McKinster, J., concurred.

Respondent's petition for review by the Supreme Court was denied June 23, 1994.