808 So.2d 999 (2001)
KARL STORZ ENDOSCOPY-AMERICA, INC., et al.
v.
INTEGRATED MEDICAL SYSTEMS, INC.
1000580.
Supreme Court of Alabama.
July 6, 2001.
*1001 William A. Scott, Jr., Wayne Morse, and Bradley J. Smith of Clark & Scott, P.C., Birmingham, for appellants.
Tom Burgess, Thomas S. Hale, and Murray H. Gibson, Jr., of Lamar, Burgess, Hale, Miller, Norris & Feldman, P.C., Birmingham, for appellee.
WOODALL, Justice.
Karl Storz Endoscopy-America, Inc., and others (collectively "KSEA") appeal from an order denying their motion to compel arbitration of this dispute with Integrated Medical Systems, Inc. ("IMS"). We reverse and remand.
KSEA, a California corporation, is a "wholly-owned subsidiary of Karl Storz's GmbH & Co. (`Storz'), located in Tuttlingen, Germany." It is the "exclusive" national distributor of a medical device known as the "Storz Rigid Endoscope" *1002 (the "Storz Endoscope"). IMS is an Alabama Corporation that purports to "repair" rigid endoscopes, including the Storz Endoscope.
This dispute arises out of the settlement of an action commenced by KSEA against IMS in United States District Court for the Central District of California. In essence, the complaint in that action alleged that the "repairs" effected by IMS amounted to a "remanufacture" of the Storz Endoscope and constituted, among other things, a trademark infringement. That litigation culminated in a comprehensive Settlement Agreement (the "Agreement"), effective September 1, 1998.
The Agreement provided in pertinent part:
"IV. PROVISIONS RELATING TO THE UNDERTAKINGS HEREIN
"A. Neither this agreement, nor the fact of compliance by any party with the terms of the agreement, is intended by the parties to define or circumscribe, or reflect acquiescence inother than for purposes of the agreementpast, present or future activities constituting or not constituting trademark or trade dress infringement or unfair competition with respect to activities performed on or to a KARL STORZ Rigid Endoscope."
"XI. TERM AND TERMINATION
". . . .
"B. This agreement may be terminated by ... IMS ... in the event of material breach by KSEA, which has not been satisfactorily cured within 30 days of the sending of written notice of said breach. In the event of termination as a consequence of material breach, ... the provisions of this agreement as between or among the terminating parties shall become null and void...."
"XII. MEDIATION/ARBITRATION:
"A. Except as otherwise specifically provided for herein, any dispute relating to whether a material breach of this agreement has occurred by any party... shall initially be attempted to be resolved by the involved parties through non-binding mediation to be commenced within 30 days following expiration of the period for cure of a noticed breach....
"B. If within 30 days after the commencement of mediation, a resolution of the dispute has not been achieved, the dispute may thereafter be submitted by any party to binding arbitration under the commercial rules of the American Arbitration Association then in effect.... The forum of arbitration shall be Chicago, Illinois, but the governing law for such arbitration nevertheless shall be the law of the State of California. The scope of binding arbitration shall, as noted, be strictly limited to ... a determination of whether a material breach of this agreement permitting termination has occurred, and the award of compensatory damages therefor, if any,... and shall in no manner encompass any issues respecting the validity, enforceability or infringement of any KSEA trademarks or trade dress, or unfair competition or any like cause or issue related thereto, which issues, matters and causes are reserved for U.S. district court determination as may be initiated in the event of termination of this agreement.... Each party is required to continue to perform its obligations under this agreement pending final resolution of any such dispute."

*1003 "XVI. APPLICABLE LAW
"The validity and interpretation of this agreement shall be governed by and construed in accordance with the laws of the State of California."
The execution of the Agreement was followed almost immediately by a series of communications between representatives of IMS and KSEA regarding compliance with its terms. A letter dated October 20, 1998, from a representative of IMS stated:
"As we have discussed, Storz has been charging `repair-exchange' prices to IMS customers that exceed standard rates. Also, Storz representatives have been aggressively, and incorrectly, telling customers across the country that the settlement represents a defeat for IMS and a surrender to Storz's demands.
"IMS formally requests, therefore, that (a) Storz immediately comply with Section III.B. of the Agreement so that IMS customers are charged the same prices as Storz customers; and (b) Storz implement whatever measures are necessary to prevent the breach of Section IX. by its sales representatives.
"Please consider this a notice of material breach pursuant to Section XI.B. of the Agreement."
(Emphasis added.)
KSEA responded in a letter dated October 22, 1998, stating in part:
"We are not aware of any instances where an IMS customer has been charged `repair-exchange' prices by KSEA that exceed KSEA's existing standard rate list prices therefor. However, if you will provide me with particulars of the customers and transactions you have reference to, we will have KSEA pull the relevant invoices and we will promptly get back to you.
"As for statements allegedly made by KSEA sales representatives, again we are not aware of any instances of the type you have referenced. If you will provide me with specifics of the individuals, customers and dates involved, we will have KSEA investigate this promptly."
By a letter dated November 4, 1998, IMS responded as follows:
"I received your October 22 letter. Under ordinary circumstances, I would certainly understand your request for documentation of Storz's predatory pricing and disparagement that constitute breaches of the settlement agreement. However, Chip [Antoine] has acknowledged to Gene [Robinson] and Bo [Mundy] that these actions are taking place and states that he can't do anything about them. This response is unacceptable, and IMS requests mediation pursuant to the settlement agreement.

"Notice of breach was transmitted October 21, so the mediation should take place on or before November 21 in Chicago. Please call me so that we can work out the details."
(Emphasis added.)
KSEA responded with a letter dated November 6, 1998, stating in pertinent part:
"It is our understanding that you were not in attendance at the meeting last week among Chip Antoine, Gene Robinson and Bo Mundy. Based upon the information we have been provided, your sense of the tenor and conclusions of that meeting, and in particular your attribution to Mr. Antoine of certain acknowledgements allegedly made by him, is inaccurate.
"What you have elected to term as `predatory pricing' is, as we understand it, nothing of the sort. The agreement provides that, for services performed by *1004 KSEA for [IMS] customers (for example, the provision of `refurbish/exchange' scopes), KSEA will bill the customer at KSEA's then-existing standard rates therefor. We are not aware of any instance where KSEA's billing to the customer was not in strict compliance with this agreement provision based upon the existing KSEA standard list prices. It is always possible, or course, that some instances of miscommunication might have occurred between IMS reps and KSEA's customer service department in connection with requests for pricing. This is precisely why we have requested details from you so that we can see if anything of this nature may have inadvertently occurred, and we would continue to encourage you to give us some specifics.
"As for what you have elected to term as `disparagement,' you appear to be unaware that, at the meeting last week, KSEA too expressed concerns about instances of misinformation and/or misrepresentation by IMS sales reps that had come to its attention. We understand that the conclusion of the meeting in this respect was that the parties would each draft for review a suitable clarifying communication to their respective sales forces regarding the agreement relationship.
"In short, we were given to understand that the meeting last week was very productive in airing, discussing and clarifying the parties' relationship, and that agreement was had to further confer in certain of these respects in the near future. We trust that the formal and adversarial tone of your letter is born simply of not having all the facts, rather than an intention to announce a complete change of attitude on the part of your clients.
"For at least these reasons, your demand for mediation is not considered warranted, nor does it accurately carry out (and indeed directly contradicts and interferes with) what we understand to be the intentions of the parties based upon the meeting. Moreover, the agreement provision for mediation cannot in any event be invoked until the expiry of the cure period, so your demand is premature."
(Emphasis added.)
In a letter dated November 17, 1998, IMS stated:
"It is true that the parties do not have to schedule or convene a mediation session prior to the lapse of the cure period. However, based on my understanding of the Florida meeting and Storz's ongoing course of conduct, I doubt that Storz will halt its breaches of the agreement in the next week.
"Chip's recent statement that he hopes IMS will someday be unable to repair any Storz scopes, Storz's refusal to charge IMS the standard contract rates at the hospitals under contract with Storz, and the campaign of misrepresentation and disinformation which Storz reps are waging against IMS across the country all argue for scheduling a mediation session as quickly as possible."
KSEA responded in a letter dated November 18, 1998, stating in pertinent part:
"From the tenor of your letters we assume that there are problems that need resolution, and we should be trying to work together to resolve them as opposed to poisoning the environment. We should plan to confer as soon as possible with all counsel and parties to get a handle on the problems; if we cannot resolve the issues, whatever they may be, we can then discuss mediation.
"We suggest that a telephone conference or meeting be scheduled early next *1005 week or during the week of November 30, 1998."
(Emphasis added.)
KSEA's proposal for a pre-mediation meeting was reiterated in a letter dated November 24, 1998:
"This will acknowledge our telephone conversation this morning in which you advised thatnotwithstanding the request for a meeting as set forth in my letter to you of November 18, and repeated in my phone messages to you and our conversation yesterday afternoon your clients are not interested in such a meeting and wish to proceed to mediation.
"As I have previously advised you, and repeated this morning, we do not consider that mediation is ripe inasmuch as you have yet to provide the information necessary for us either to properly evaluate your claims of breach or to effectuate a cure (if such be needed) within the time afforded therefor in the agreement. I understand that you do not agree with this, but that in any event you will be providing me soon with some details of your client's complaints.
"Needless to say, we find your client's refusal to meet with us disturbing and regrettable."
(Emphasis added.)
In a letter dated December 3, 1998, IMS recited a number of "promises" allegedly made by KSEA, and agreed to a meeting with KSEA, provided that, before the meeting, KSEA "(a) followe[d] through on the promises listed ...; (b) agree[d] to participate in mediation within 10 days of the meeting if the meeting [did not] result in a signed timetable for curing the breaches identified by the parties; and (c) sen[t] its head of U.S. sales to the meeting." To these proposals, KSEA replied in a letter dated December 9, 1998:
"Thank you for your letter of December 3. Subject to the comments below, I believe we are headed at least generally in the right direction.
". . . .
"Be that as it may, and as is evident from my prior correspondence and our past conversations, we are in favor of a frank face-to-face meeting among principals and attorneys preliminary to any decision on whether mediation is necessary. We are also willing to agree that mediation be had at some reasonable time thereafter if the meeting results in an intractable impasse. Your proposed 10-day time period would generally be acceptable, with appropriate leeway for accommodating the schedules of all persons who need to be involved. We will also look into the possibility of having KSEA's head of U.S. sales participate in the meeting, but it cannot be a precondition to a meeting.
". . . .
"We look forward to hearing back from you with some proposals for meeting dates. I presume you are contemplating a Chicago locale, but let me know if you have something else in mind."
(Emphasis added.) Early in January 1999, KSEA followed up this correspondence with a letter, stating: "Just following up on my letter ... of December 9, 1998, and the [tele]phone message I left you before the Christmas holiday. We look forward to hearing from you regarding details underlying your client's complaints, and regarding a face-to-face meeting among principals and counsel to discuss these matters." (Emphasis added.)
On February 19, 1999, however, IMS filed a two-count complaint in Jefferson Circuit Court against KSEA. The complaint alleged in part:

*1006 "5. Pursuant to the Settlement Agreement, KSEA provided IMS with Storz's performance specifications for rigid endoscopes. The Settlement Agreement also provided, among other things, (1) that IMS would continue to perform a variety of repairs to Storz rigid endoscopes; (2) that KSEA would provide refurbished Storz endoscopes to IMS, or would exchange endoscopes that could not be refurbished, at KSEA's then current standard prices; (3) that KSEA would pay IMS a commission on rigid endoscopes sent to Storz for refurbishing or exchange on behalf of IMS customers; and (4) that any public comments by IMS or KSEA regarding the lawsuit between them or its settlement would be consistent with the terms of a joint press release issued pursuant to the Settlement Agreement.
"6. Since the parties entered into the Settlement Agreement, KSEA repeatedly and systematically has breached its provisions by informing IMS customers (1) that IMS is not qualified to repair or service Storz endoscopes; (2) that IMS repairs do not meet Storz specifications; and (3) that IMS is overcharging customers for the repair or exchange of Storz endoscopes. In addition, KSEA not only has refused to provide IMS with refurbished endoscopes (or exchanges) at KSEA's standard prices, but also has attempted to subvert its contractual obligations to IMS by offering to provide refurbished endoscopes or exchanges directly to IMS customers."
Count One contained a breach-of-contract claim. In particular, it averred:
"7. The allegations of paragraphs 1 through 6 of the complaint are incorporated by reference.
"8. By the conduct described above, KSEA has breached the provisions of the Settlement Agreement. By virtue of such breaches, IMS has sustained and will continue to sustain financial loss and irreparable injury to its business and its relationships with actual and prospective customers."
(Emphasis added.)
Count Two stated a claim of "intentional interference with business relations." It alleged in pertinent part:
"10. At all times material to the matters alleged in this complaint, IMS had contracts or business relationships with customers for service and repair of Storz rigid endoscopes. KSEA ... had actual knowledge of IMS's contracts or business relationships. KSEA ... intended, by the conduct described in paragraph 6 above, to interfere with IMS's contracts or business relationships with its customers. As a consequence of the actions and conduct of KSEA ..., IMS has sustained and will continue to sustain financial loss and irreparable injury to its business and its relationships with actual and prospective customers."
(Emphasis added.) KSEA immediately moved to compel arbitration on the basis of § XII of the Agreement.
Subsequently, IMS twice amended its complaint. The complaint as last amended sought, in addition to relief under the two claims pleaded initially, (1) rescission of the Agreement, and relief under claims of (2) defamation, and (3) conspiracy. Its amended intentional-interference-with-business-relationships claim stated as follows:
"11. In addition to KSEA's breach of the Settlement Agreement, KSEA ... [has] engaged in a number of other wrongful activities against IMS not related to or arising out of the Settlement Agreement, but which are governed by and arise from general tort law and which constitute independent torts regardless *1007 of the existence of the Settlement Agreement.
"12. Specifically, defendants have embarked upon a general campaign of dissemination of misinformation against IMS and other companies which repair rigid endoscopes. One apparent purpose of this campaign is to divert business from IMS and otherwise interfere with or hamper IMS's business relations by raising false concerns and fears about the overall safety, quality, and value of the services performed by IMS and similar companies.
"13. As part of this unlawful campaign, defendants have falsely and repeatedly informed IMS customers (1) that IMS is not qualified to repair or service Storz endoscopes; (2) that IMS repairs do not meet Storz specifications; and (3) that IMS is overcharging customers for the repair or exchange of Storz endoscopes.
"14. KSEA, at the direction of Storz, has also, upon information and belief, paid Halsted Communications, Inc. d/b/a Health Information Network (collectively referred to as `HIN'), to set up a website on the internet for the purpose of distributing defamatory, false and misleading information about the safety and quality of work performed by IMS and other similar repair companies. In addition to defamatory articles about IMS, the website distributes and solicits offers for a free publication entitled `The Dangers [or Hazards] of Unauthorized Repair of Medical Devices.' The website is entitled `HealthInform.Net' and is located on the internet at `www.healthinform.net.' The website publishes its defamatory and misleading information worldwide, including the State of Alabama, under a false appearance of objectivity and neutrality.
"15. Also as part of this campaign, defendants have raised complaints with the U.S. Food and Drug administration about the services offered by IMS in an apparent attempt to legitimize or add credibility to the concerns, fears, and other misleading information disseminated by defendants."
Its "defamation" count alleged in substantive part:
"18. The allegations of paragraphs 11 through 17 are realleged and incorporated by reference as if set out fully herein.
"19. KSEA ... [has] published or caused to be published oral and written statements which are defamatory and injurious to IMS's reputation. IMS has made various requests that defendants cease, correct, and/or retract their defamatory conduct, but they have failed and refused to do so, and any further requests in this regard would be useless."
The trial court denied KSEA's motion to compel arbitration, stating:
"With regard to defendants' request for arbitration, the court notes that the Settlement Agreement between the parties requires mediation as a precondition to arbitration. The court also notes the arbitration provision at issue states in pertinent part that `[t]he scope of binding arbitration shall, as noted, be strictly limited to ... a determination of whether a material breach of this agreement permitting termination has occurred, and the award of compensatory damages there[for].'
"Accordingly, the court finds based on the evidence before it that 1) the defendants waived their right to require arbitration by failing to mediate plaintiff's contract claims, and 2) even if defendant had not waived the right to arbitration, plaintiff would not be required to arbitrate *1008 its tort claims as those claims are not within the scope of the arbitration provision."
(Emphasis added.)
From that order, KSEA appealed. The appeal presents issues regarding the interpretation of the Agreement in general and the scope of § XII in particular. It also requires us to consider whether KSEA's conduct after its receipt of the November 4, 1998, letter constituted a waiver of the right to compel arbitration. The parties agree that the resolution of these issues turns on the application of the substantive law of California, within the framework of the Federal Arbitration Act, 9 U.S.C. § 1 et seq. (the "FAA"). For reasons of logic and convenience, we address the waiver issue first.

I. Waiver
IMS argues, and the trial court agreed, that KSEA waived the right to compel arbitration by its response, or the absence thereof, to the November 4, 1998, letter from IMS "request[ing] mediation pursuant to the settlement agreement." On appeal, KSEA makes a two-point response to the waiver argument. First, it contends that the trial court erred in considering the waiver issue. Second, it insists that the court erred in finding that a waiver occurred.
As to the first point, KSEA insists that "whether a party seeking arbitration has waived its right to arbitration by failing to comply with procedural requirements set forth in the arbitration agreement," is a matter of "procedural arbitrability," which, KSEA argues, is "for the arbitrator to decide," and not for the court. Brief of Appellants, at 9-10 (emphasis added). For this proposition, KSEA cites Dean Witter Reynolds, Inc. v. McDonald, 758 So.2d 539 (Ala.1999). However, KSEA did not cite this case or present this argument to the trial court. The trial court, therefore, considered the waiver issue without a specific objection from KSEA. For that reason, we will review the substance of the court's determination.
Ordinarily, we review issues regarding waiver of arbitrability under an abuse-of-discretion standard. See Ex parte Handley, 775 So.2d 141, 143 (Ala. 2000); Thompson v. Skipper Real Estate Co., 729 So.2d 287 (Ala.1999); Companion Life Ins. Co. v. Whitesell Mfg., Inc., 670 So.2d 897 (Ala.1995); Ex parte McKinney, 515 So.2d 693 (Ala.1987). It appears undisputed, however, that evidence of the alleged waiver consists entirely of the written correspondence between IMS and KSEA beginning November 4, 1998. Where the resolution turns solely on the significance to be ascribed to documents, the trial court is in no betteror different position than this Court to decide the legal significance of a party's conduct. Cf. Ex parte Allen, 798 So.2d 668, 675 n. 4 (Ala.2001) (in resolving a waiver issue, "the trial court has no discretion to deviate from a case that is directly on point" (emphasis omitted)). Therefore, we review this issue de novo.
In our review, we must remember that "[b]ecause of the strong federal policy favoring arbitration, courts will not lightly infer a waiver of arbitration rights." Ex parte Smith, 736 So.2d 604, 610 (Ala.1999) (citing Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)).
KSEA contends that its response to the November 4, 1998, "request [for] mediation" cannot be characterized as a denial or repudiation of the request. In fact, it insists, it was "preparing for a face-to-face pre-mediation meeting in which all claims would be discussed and, presumably, *1009 documented. As of January 1999, [KSEA] believed and [was] informed that IMS was proceeding toward that meeting in good faith." Brief of Appellant, at 9. In essence, KSEA argues that IMS failed to satisfy reasonable conditions prior to mediation, which was a condition precedent to any right to compel arbitration. Therefore, KSEA argues that in waiting for IMS to provide information and documentation necessary to begin mediation, it cannot be deemed to have waived its right to compel arbitration. Our review of the correspondence and the relevant provisions of the Agreement compels us to agree with KSEA.
At least two of KSEA's letters to IMS, namely, those of November 6 and November 24, focused on "curing" the breaches of which IMS was complaining. In this connection, § XI.B. of the Agreement expressly provided for a 30-day cure period following notification of an alleged material breach. Indeed, IMS acknowledged in its letter of November 17, 1998, that KSEA could not be compelled to commence mediation until the expiration of a 30-day cure period. KSEA's requests for documentation of the alleged breaches for purposes of cure were both reasonable and logical. As such, the refusal of IMS to supply such information is unreasonable and may not form the basis of a waiver argument.
In short, the correspondence reveals that as late as January 4, 1999, IMS had not only failed to provide requested information relevant to a pre-mediation cure, but had also conveyed the impression that it was preparing for a face-to-face, premediation meeting with KSEA to discuss details of its allegations for purposes of cure. Instead of following through with those impressions, it commenced this action on February 19. The conduct of KSEA, however, was not inconsistent with the provisions of the Agreement regarding pre-cure notification, pre-cure documentation, pre-mediation cure, or pre-arbitration mediation. We hold, therefore, that KSEA did not waive its right to compel arbitration by relying on provisions of the Agreement that were conditions precedent to arbitration. We next address the arguments of IMS regarding construction and scope of the arbitration provision.

II. Construction and Scope
In this connection, IMS contends that (1) the Agreement contemplates only permissive not mandatoryarbitration; and that (2) some of its claims are outside the scope of the provision.

A. Permissive Arbitration
IMS contends that "the trial court's order ... should be upheld regardless of whether KSEA refused to mediate IMS's claims because the arbitration provision expressly provides that arbitration is optional to the aggrieved party, not mandatory." Brief of Appellee, at 30 (emphasis in original). "This point is evident," IMS continues, "from the language of the provision, which uses the mandatory verb `shall' in reference to mediation but uses the permissive verb `may' with regard to arbitration." Id. (emphasis in original).
In this connection, § XII provides:
"A. Except as otherwise specifically provided for herein, any dispute relating to whether a material breach of this agreement has occurred by any party... shall initially be attempted to be resolved by the involved parties through non-binding mediation to be commenced within 30 days following expiration of the period for cure of a noticed breach....
"B. If within 30 days after the commencement of mediation, a resolution of the dispute has not been achieved, the dispute may thereafter be submitted by any party to binding arbitration under *1010 the commercial rules of the American Arbitration Association then in effect...."
(Emphasis added.)
We disagree with IMS. Its construction of these provisions is contrary to logic and to the weight of authority, both California and federal. The California rule was thoroughly discussed in Erickson v. Aetna Health Plans of California, 71 Cal.App.4th 646, 84 Cal.Rptr.2d 76 (1999). In that case, Aetna Health Plans of California, Inc. ("Aetna"), appealed from an order denying its motion to compel arbitration of a dispute over its duty to provide "cancer treatment.... under a [replacement Medicare] plan called Senior Choice." Id. at 649, 84 Cal.Rptr.2d at 78. The arbitration provision, which was included in the "Senior Choice handbook," provided: "`If you are not satisfied with the [grievance panel's] proposed resolution, you may request binding arbitration.'" Id. (emphasis added). The insured argued that the word "may" rendered arbitration "voluntary." Id. at 659 n. 6, 84 Cal.Rptr.2d at 83, n. 6. The California Court of Appeal for the Fourth District rejected that argument.
In doing so, it first set forth the general framework in which California construes agreements to arbitrate, stating: "`California law incorporates many of the basic policy objectives contained in the FAA, including a presumption in favor of arbitrability....'" 71 Cal.App.4th at 655, 84 Cal.Rptr.2d at 82. "Thus, even in non-FAA cases, courts `are guided by the rule that, contractual arbitration being a favored method of resolving disputes, every intendment will be indulged to give effect to such proceedings.'" Id. (some internal quotation marks omitted).
Next, the court discussed the legal effect of the word "may" in the arbitration context. It explained:
"The parties have not identified any authority construing the precise language at issue here, and we are aware of none. They do, however, cite three decisions which are instructive, as all concerned agreements which, like the present one, provided that disputes `may' be submitted to arbitration. In the first, Service Employees Internat[ional] Union, Local 18 v. American Building Maintenance Co., (1972) 29 Cal.App.3d 356 [105 Cal.Rptr. 564] (Service Employees), the agreement provided that `the issue in dispute may be submitted to an impartial arbitrator.' (Id., at p. 358 [, 105 Cal.Rptr. 564], italics omitted.) The court held the clause provided for mandatory rather than consensual arbitration. Since the parties always could elect consensual arbitration without a contract provision, interpretation of the clause to require only consensual arbitration would make the provision of little purpose. (Ibid). The court concluded the word `may' in this context merely meant a party who did not want arbitration had the option to abandon the claim. (Id., at p. 360 [, 105 Cal.Rptr. 564].)
"In Titan Group, Inc. v. Sonoma Valley [County] Sanitation Dist., [164 Cal. App.3d 1122, 211 Cal.Rptr. 62 (Ct.App. 1985)] (Titan), the agreement similarly stated that disputes `may' be subject to the decision of a third person to be agreed upon by the parties. However, it also provided that all disputes `... will be decided by arbitration if the parties hereto mutually agree, or in a court of competent jurisdiction within the State in which the owner is located.' (Id., at p. 1125 [, 211 Cal.Rptr. 62], original and added [emphasis].) The court found no mandatory arbitration requirement, distinguishing Service Employees on the basis that the agreement in that case made no mention of a court proceeding *1011 as an available option. (Id., at p. 1129 [, 211 Cal.Rptr. 62].)
"In Pacific Gas and Electric Co. v. The Superior Court of Sutter County, [15 Cal.App.4th 576, 19 Cal.Rptr.2d 295 (Ct.App.1993)] (Pacific Gas & Electric), the agreement stated disputes `may be submitted' by either party to arbitration. (Id., at p. 595 [, 19 Cal.Rptr.2d 295].) The court concluded this provision mandated arbitration, stating, `In this context the "may" signifies the right of the party to invoke arbitration.' (Ibid).
"Applying these decisions, and keeping in mind the policy, discussed ante, favoring construction of agreements in favor of arbitration, we conclude the provision in this case should be interpreted to require arbitration rather than merely to permit it. As did the courts in Service Employees and Pacific Gas & Electric, we construe the permissive language to mean simply that a member may, in lieu of proceeding to arbitration, merely forgo further review and accept the proposed resolution of the grievance panel."
71 Cal.App.4th at 656-57, 84 Cal.Rptr.2d at 83 (some internal quotation marks omitted). Consequently, the court reversed the order of the trial court denying Aetna's motion to compel arbitration.
Erickson is fully consistent with cases from federal courts addressing similar language. See, e.g., Held v. National R.R. Passenger Corp., 101 F.R.D. 420, 424 (D.D.C.1984) ("[T]he use of the word `may' in an arbitration agreement does not imply that the parties to the agreement have the option of invoking some remedy other than arbitration."); Austin v. Owens-Brockway Glass Container, Inc., 78 F.3d 875, 879 (4th Cir.) ("If the parties to such an agreement intended for arbitration to be permissive, there would be no reason to include... the arbitration provision in the contract, for the parties to an existing dispute could always voluntarily submit it to arbitration"), cert. denied, 519 U.S. 980, 117 S.Ct. 432, 136 L.Ed.2d 330 (1996); American Italian Pasta Co. v. Austin Co., 914 F.2d 1103, 1104 (8th Cir.1990); Atkins v. Louisville & Nashville R.R., 819 F.2d 644, 648-49 (6th Cir.1987) (arbitration was mandatory, despite language stating that disputes "may be referred by either party to an arbitration committee"); Bonnot v. Congress of Indep. Unions, Local No. 14, 331 F.2d 355, 359 (8th Cir.1964); Deaton Truck Line, Inc. v. Local Union 612, 314 F.2d 418, 422 (5th Cir.1962); McCrea v. Drs. Copeland, Hyman & Shackman, P.A., 945 F.Supp. 879, 881 (D.Md.1996); Block 175 Corp. v. Fairmont Hotel Mgmt. Co., 648 F.Supp. 450 (D.Colo.1986).
Moreover, IMS's argument that the Agreement makes arbitration "optional to the aggrieved party," Brief of Appellee, at 30 (emphasis added and omitted), directly contradicts the express language of § XII.B. Specifically, that section begins: "If within 30 days after the commencement of mediation, a resolution of the dispute has not been achieved, the dispute may thereafter be submitted by any party to binding arbitration under the commercial rules of the American Arbitration Association then in effect...." Thus, the right to proceed in arbitration is not secured for the aggrieved party only, as IMS contends, but for all parties. As a logical and practical matter, this provision can only mean what KSEA contends that § XII provides, namely, that neither party may force the other party into a judicial forum. Under the rules set forth in Erickson, IMS and KSEA merely agreed, either to arbitrate their disputes, or, to "forgo further review and accept the [status of the dispute after mediation]." 71 Cal. App.4th at 657, 84 Cal.Rptr.2d at 83.

*1012 B. Scope

Next, IMS contends that its tort claims are outside the scope of the arbitration provision, and, therefore, may be decided in a judicial forum. Specifically, it argues: "The arbitration provision ... states that the scope of arbitration shall be `strictly limited to ... a determination of whether a material breach ... permitting termination has occurred.' By the plain language of the provision, one and only one claim is contemplated, i.e., whether a breach justifying contract termination has occurred." Brief of Appellee, at 26 (emphasis in original). IMS thus insists that the arbitration clause does not include its tort claims of (1) intentional interference with business relations, (2) defamation, or (3) conspiracy.
This argument simply ignores crucial portions of § XII. As we noted earlier in this opinion, § XII.A. provides: "[A]ny dispute relating to whether a material breach of this agreement has occurred by any party ... shall initially be attempted to be resolved by the involved parties through non-binding mediation...." For ease of discussion, we shall refer to this clause as ¶ 1. Next, § XII.B. provides:
"[T]he dispute may [after failure of mediation] be submitted by any party to binding arbitration.... The scope of binding arbitration shall, as noted, be strictly limited to ... a determination of whether a material breach of this agreement permitting termination has occurred... and the award of compensatory damages therefor, if any, ... and shall in no manner encompass any issues respecting the validity, enforceability or infringement of any KSEA trademarks or trade dress, or unfair competition or any like cause or issue related thereto...."
We shall refer to this provision as ¶ 2.
We construe these provisions according to the well-established California rule, for-bidding construction of contract terms in isolation. See Cal. Civ.Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other"). "The contract must be construed as a whole; detached words or clauses standing alone are not controlling on the question of interpretation, each being viewed in relation to the agreement as an entity." Cedars-Sinai Med. Ctr. v. State Bd. of Equalization, 162 Cal.App.3d 1182, 1188, 208 Cal.Rptr. 837, 840 (1984); see also SDC/Pullman Partners v. Tolo Inc., 60 Cal.App.4th 37, 46, 70 Cal.Rptr.2d 62, 67 (1997) ("contract terms cannot be read in isolation"); Transamerica Ins. Co. v. Sayble, 193 Cal.App.3d 1562, 1566, 239 Cal.Rptr. 201, 203 (1987) ("The contract must be construed as a whole, without giving a distorting emphasis to isolated words or phrases").
IMS's construction runs afoul of this principle. This is so, because it focuses on ¶ 2 in isolation, ignoring ¶ 1. However, ¶ 2 must be read to harmonize with ¶ 1, and with § XII as a whole. The second sentence of ¶ 2 states that the "scope of binding arbitration shall [be] as noted." "As noted" refers the reader back to ¶ 1, where it was previously "noted." In other words, "as noted" makes clear that the scope of ¶ 2 is not intended to be different than the scope of ¶ 1. Reading the two provisions as a whole broadens the arbitration clause beyond the scope attributed to it by IMS. However, it merely brings ¶ 2 into harmony with ¶ 1.
When the two portions are combined, the arbitration clause provides: "[A]ny dispute relating to whether a material breach of this agreement [permitting termination] has occurred by any party.... may [after failure of mediation] be *1013 submitted by any party to binding arbitration...." Moreover, it is often observed that the words "relating to" in the arbitration context are given a broad construction. See Beaver Constr. Co. v. Lake-house, L.L.C., 742 So.2d 159, 165 (Ala. 1999); Reynolds & Reynolds Co. v. King Autos., Inc., 689 So.2d 1 (Ala.1996); Old Republic Ins. Co. v. Lanier, 644 So.2d 1258 (Ala.1994).
IMS also relies on the words "permitting termination," arguing that the scope of arbitration is "strictly limited" to such breaches as would permit termination of the Agreement.[1] "Nonmaterial" breaches would, according to IMS, be outside the scope of the arbitration clause and would be triable in a judicial forum. The logical weakness of this argument is apparent. Whether a breach is material is ordinarily a question for the trier of fact. Fantasy, 984 F.2d at 1530. Thus, any judicial inquiry into the materiality of an alleged breach would necessarily involve the court in, at least, a de facto resolution of the merits of the breach-of-contract claim. Such a process would render entirely illusory the right to a resolution through arbitration. However, "it is presumed that parties intend to make reasonable contracts." Ex parte Bonds, 581 So.2d 484, 487 (Ala.1991) (emphasis added) (internal quotations omitted). We can only presume that the parties did not intend the arbitration provision to be illusory.
Finally, IMS argues that the scope of ¶ 2 is subject to the further restriction that arbitration "shall in no manner encompass any issues respecting the validity, enforceability or infringement of any KSEA trademarks or trade dress, or unfair competition or any like cause or issue related thereto." (Emphasis added.) This clause does not aid IMS. It is merely a restatement of § IV.A., which provides: "Neither this agreement, nor the fact of compliance by any party ..., is intended... to define or circumscribe ... past, present or future activities constituting... trademark or trade dress infringement or unfair competition with respect to activities performed on or to a KARL STORZ Rigid Endoscope." Section IV.A. defines the scope of the Agreement in relation to "activities [IMS] perform[s] on or to a KARL STORZ Rigid Endoscope." (Emphasis added.) Indeed, it is KSEA and not IMS that holds rights redressable by such claims. Thus, the reiteration of this language in the arbitration clause does not, somehow, expand the scope of IMS's right to sue KSEA.
In cases interpreting a variety of arbitration provisions, California courts have noted that "the fact that [the] action sounds in tort rather than contract is not a valid basis for [an] order denying [a] petition to compel arbitration." Merrick v. Writers Guild of America, West, Inc.,[2] 130 Cal.App.3d 212, 219-20, 181 Cal.Rptr. 530, 534 (1982). California courts will compel *1014 arbitration as long as the "action has its roots in the relationship between the parties which was created by the ... agreement." Id. at 219, 181 Cal.Rptr. at 534 (emphasis added). See also Coast Plaza Doctors Hosp. v. Blue Cross of California, 83 Cal.App.4th 677, 99 Cal.Rptr.2d 809 (2000); Wolitarsky v. Blue Cross of California, 53 Cal.App.4th 338, 61 Cal.Rptr.2d 629 (1997); Vianna v. Doctors' Mgmt. Co., 27 Cal.App.4th 1186, 33 Cal.Rptr.2d 188 (1994); Izzi v. Mesquite Country Club, 186 Cal.App.3d 1309, 1315-16, 231 Cal.Rptr. 315, 317 (1986); Bos Material Handling, Inc. v. Crown Controls Corp., 137 Cal. App.3d 99, 186 Cal.Rptr. 740 (1982); Berman v. Dean Witter & Co., 44 Cal.App.3d 999, 1003, 119 Cal.Rptr. 130, 133 (1975).
Merrick, for example, involved an arbitration clause that provided in part:
"Except as otherwise specifically provided in this Article or elsewhere in this basic Agreement, the following matters shall be submitted to ... arbitration as hereinafter provided, and no other matters shall be submitted to ... arbitration: [¶] 1. Any dispute between the [Writers Guild of America, West, Inc., (`Guild')] and the Company concerning the interpretation of any of the terms of this Basic Agreement and the application and effect of such terms as determined by an interpretation thereof...."
130 Cal.App.3d at 217, 181 Cal.Rptr. at 532-33 (emphasis added). Pursuant to that provision, the Guild "brought to arbitration a claim of two of its members against [motion-picture producer David] Merrick for breach of his agreement to compensate them for writing a screenplay." Id. at 215, 181 Cal.Rptr. at 531. After an arbitrator ruled in favor of Merrick, Merrick sued the Guild, seeking compensation for "malicious prosecution, abuse of process, and `prima facie tort.'" Id.
The trial court denied the Guild's motion to compel arbitration on the ground that "Merrick's claims of malicious prosecution and abuse of process [arose] out of tort, not contract, and therefore [did] not come within the scope of the arbitration provisions." Id. at 216, 181 Cal.Rptr. at 532. The Court of Appeal reversed the order denying arbitration. Explaining that the complaint did not "assert claims which [were] wholly independent of the arbitration provisions," id. at 219, 181 Cal.Rptr. at 534, the court concluded that the "action ha[d] its roots in the relationship between the parties which was created by the ... agreement." Id.
The scope of the arbitration clause in the Agreement is comparable to the scope of the clause in Merrick. The inquiry must, therefore, focus on whether the facts alleged in the complaint as the basis for IMS's tort claims have their "roots in the relationship between the parties which was created by the ... agreement." Merrick, 130 Cal.App.3d at 219, 181 Cal.Rptr. at 534.
The intentional interference claim rests upon allegations that KSEA intentionally interfered with IMS's customer relations by, among other things, "falsely and repeatedly inform[ing] IMS customers (1) that IMS is not qualified to repair or service Storz endoscopes; (2) that IMS repairs do not meet Storz specifications; and (3) that IMS is overcharging customers for the repair or exchange of Storz [E]ndoscopes." These allegations directly implicate § II of the Agreement.
Section II is styled "UNDERTAKINGS OF IMS ... WITH RESPECT TO REPAIRS/SERVICES IN CONNECTION WITH KARL STORZ RIGID ENDOSCOPES." It comprehensively defines IMS's rights and duties in connection with its repair of Storz Endoscope. Furthermore, *1015 § II.C. requires IMS to "inform any customer or client seeking `repair'" of a Storz Endoscope that it cannot make the repair, if such repair would violate the detailed specifications set out in the Agreement. These allegations, therefore, not only "[have their] roots in the relationship between the parties which was created by the ... agreement," Merrick, 130 Cal. App.3d at 219, 181 Cal.Rptr. at 534, but would constitute proof of both the breach-of-contract claim and the intentional interference claim.
The same may be said of the defamation claim, which alleged that KSEA "published or caused to be published oral and written statements which are defamatory and injurious to IMS's reputation." This claim also rests, at least in part, upon the allegations that KSEA was "informing IMS customers (1) that IMS is not qualified to repair or service Storz endoscopes; (2) that IMS repairs do not meet Storz specifications." Moreover, § IX of the Agreement, styled "STATEMENT," dealt expressly with the type of information that could be disseminated by the parties regarding the substance of the settlement.
We conclude, therefore, that the arbitration provisions in the Agreement are broad enough to encompass IMS's tort claims. This conclusion is buttressed by the correspondence between IMS and KSEA from October 20, 1998, to January 1999. For example, in its October 20, 1998, letter to KSEA, IMS complained specifically that KSEA was breaching the Agreement by "charging `repair-exchange' prices to IMS customers that exceed[ed] standard rates." It also accused KSEA's sales representatives of breaching § IX by "telling customers across the country that the settlement represent[ed] a defeat for IMS and a surrender to Storz's demands."
In its letter of November 4, 1998, IMS asserted that KSEA's "predatory pricing and disparagement ... constitute[d] breaches of the settlement agreement." In its letter of November 17, 1998, IMS stated that "the campaign of misrepresentation and disinformation which Storz rep[resentatives were] waging against IMS across the country" necessitated immediate mediation pursuant to the Agreement. The essence of the tort claims was thus asserted in the letters of IMS to KSEA and characterized as breaches of the Agreement.
Moreover, in its response to IMS's claims, KSEA's November 6, 1998, letter discussed the terms "predatory pricing" and "disparagement" within the context of specific provisions of the Agreement. Specifically, it stated:
"What you have elected to term as `predatory pricing' is, as we understand it, nothing of the sort. The agreement provides that, for services performed by KSEA for [IMS] customers (for example, the provision of `refurbish/exchange' scopes), KSEA will bill the customer at KSEA's then-existing standard rates therefor. We are not aware of any instance where KSEA's billing to the customer was not in strict compliance with this agreement provision based upon the existing KSEA standard list prices. It is always possible, or course, that some instances of miscommunication might have occurred between IMS reps and KSEA's customer service department in connection with requests for pricing. This is precisely why we have requested details from you so that we can see if anything of this nature may have inadvertently occurred, and we would continue to encourage you to give us some specifics.
"As for what you have elected to term as `disparagement,' you appear to be unaware that, at the meeting last week, KSEA too expressed concerns about instances *1016 of misinformation and/or misrepresentation by IMS sales reps that had come to its attention. We understand that the conclusion of the meeting in this respect was that the parties would each draft for review a suitable clarifying communication to their respective sales forces regarding the agreement relationship."
To be sure, the torts as pleaded in IMS's second amended complaint bore less facial resemblance to the breach-of-contract claim than did the tort claim in the initial complaint. As this Court has noted, however, "[t]he ability of competent counsel to sharpen the issue relating to the arbitration clause progressively over time is readily apparent." Jones v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 604 So.2d 332, 338 (Ala.1991).
For these reasons, we conclude that IMS's tort claims are within the scope of the arbitration provisions of the Agreement. The trial court erred in refusing to compel arbitration of this dispute. Consequently, the order of the trial court is reversed, and the cause is remanded.
REVERSED AND REMANDED.
HOUSTON, SEE, BROWN, HARWOOD, and STUART, JJ. concur.
LYONS, J., concurs in part and dissents in part as to the rationale, and dissents from the judgment.
JOHNSTONE, J., dissents.
LYONS, Justice (concurring in part and dissenting in part as to the rationale, and dissenting from the judgment).
The main opinion holds that the arbitration agreement, which by its terms is "strictly limited [in scope] to ... a determination of whether a material breach of this agreement permitting termination has occurred ... and the award of compensatory damages," 808 So.2d at 1012, should not be read so as to exclude contract claims for punitive damages and claims for breaches not rising to the level of contract termination.
I interpret this provision as embracing contract claims that could justify termination and limiting the recoverable damages to compensatory damages only. I also read it as excluding contract claims for breaches not rising to the level of contract termination. However, unless the contract claim is characterized by the claimant as not rising to the level of contract termination, the arbitrator would necessarily be required to make such a determination, and his authority to make an award would depend upon his conclusion. Simply because that result screens certain claims from arbitration that might logically also be subject to arbitration is insufficient justification to redraft the agreement. California adheres to the general rule that "`[i]n construing a contract, it is not a court's prerogative to alter it, to rewrite its clear terms, or to make a new contract for the parties.'" Hi-Desert County Water Dist. v. Blue Skies Country Club, Inc., 23 Cal.App.4th 1723, 1735, 28 Cal.Rptr.2d 909, 918 (1994), quoting Moss Dev. Co. v. Geary, 41 Cal.App.3d 1, 9, 115 Cal.Rptr. 736, 741 (1974).
Where the gravamen of the action does not charge a material breach of contract but rather sounds in tort, an arbitration agreement "strictly limited [in scope] to... a determination of whether a material breach of this agreement permitting termination has occurred and the award of compensatory damages" cannot be construed to require arbitration of the tort claims without rewriting the contract. I consider Merrick v. Writers Guild of America, West, Inc., 130 Cal.App.3d 212, 181 Cal. Rptr. 530 (1982), relied upon in the main opinion, to be distinguishable. The tort *1017 dispute in Merrick charged malicious prosecution and abuse of process in prosecuting an arbitration claim pursuant to the agreement. The court held:
"Under article 12, Merrick may seek legal remedies in court `as to any dispute which is not subject to grievance or arbitration pursuant to this Basic Agreement.' Accordingly, his right to maintain the present action depends upon whether that action constitutes a dispute subject to arbitration within the meaning of article 12. In article 10 the parties agree to submit to arbitration all questions concerning the interpretation, application and effect of any of the terms of the basic agreement, as well as all disputes as to whether the arbitrator has jurisdiction or whether any matter is arbitrable. Thus, it is for the arbitrator, not the court, to decide whether the dispute underlying Merrick's action is `subject to ... arbitration' within the meaning of article 12, that issue being determinative of his right to maintain the action."
130 Cal.App.3d at 219, 181 Cal.Rptr. at 533-34 (emphasis added).
The portion of Merrick relied upon by the main opinion ("the present action has its roots in the relationship between the parties which was created by the collective bargaining provisions of their agreement") should be held to its context of an arbitration clause requiring a broad range of disputes to be submitted to the arbitrator along with provision for arbitration of arbitrability.
I am not unmindful of the acknowledged overlap between the allegations in the tort claims and violations of the agreement that perhaps could have been litigated as claims for breach of contract. However, I am unwilling to rewrite the contract so as to expand it to cover not only material breaches of contract but any matter arising out of the relationship.
I recognize that artful pleading cannot be permitted to defeat an arbitration agreement. See, e.g., Ripmaster v. Toyoda Gosei, Co., Ltd., 824 F.Supp. 116, 118 (E.D.Mich.1993), where the scope of the arbitration agreement embraced "[a]ny dispute or controversy which may arise out of, in connection with or in relation to the Agreement, or for the breach thereof." Rejecting the plaintiffs argument that his claims, described in the complaint as fraudulent misrepresentation, unjust enrichment, and promissory estoppel, are claims in equity and that because they are not for breach of contract, did not arise under the agreement, the court, after quoting the arbitration agreement, held that the plaintiff could not evade the arbitration clause by artful pleading. See, also, Acevedo Maldonado v. PPG Indus., Inc., 514 F.2d 614, 616 (1st Cir.1975), cited in Ripmaster v. Toyoda Gosei, supra, interpreting language providing for arbitration of "any controversy or claim arising out of or relating to this Agreement or the breach thereof" to be "[b]road language [that] covers contract-generated or contract-related disputes between the parties however labeled: it is immaterial whether claims are in contract or in tort." 514 F.2d at 616.
The language before this Court is decidedly narrower and lacks the broad language "arising out of, in connection with or in relation to the Agreement, or for the breach thereof," essential to the cases rejecting artful pleading as a means of circumventing a broadly drawn arbitration clause. I would not meet artful pleading with equally artful redrafting. I therefore must respectfully dissent as to Part II.B.
I dissent as to Part II.B. and as to the judgment. Otherwise, I concur.
*1018 JOHNSTONE, Justice (dissenting).
I respectfully dissent. The defendant KSEA unjustifiably declined mediation and thereby waived its right to arbitrate; and, on the ground of this waiver, the trial court correctly denied the motion of KSEA to compel arbitration.
KSEA concocted its excuse for refusing to mediate by unilaterally adding preconditions to mediation to the contract. The contract does not contain any requirement that the parties swap documents or information or that they conduct a pre-mediation meeting before invoking the mediation clause. The mediator could, and mediators typically do, recommend and supervise the swapping of documents and information at one or more meetings of the parties as part of the mediation process itself, but this contract does not allow either party to superimpose either activity as a precondition to the mediation.
The only preconditions to mediation in the contract are the demand and the expiration of the 30-day cure period. The plaintiff IMS made its demand for mediation on November 4, 1998. As late as December 9, 1998, KSEA was still insisting on "a frank face-to-face meeting among principals and attorneys preliminary to any decision on whether mediation is necessary" and quibbling about the structure of such a meeting.
By opting to stall rather than to honor the alternative dispute resolution provisions of the contract, KSEA waived them. I respectfully submit that we should affirm the denial of the motion of KSEA to compel arbitration.
NOTES
[1] "California law provides that a party may unilaterally rescind a contract if there is a material breach by the other party." Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1529 (9th Cir.1993), rev'd on other grounds, 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994). See Cal. Civ.Code § 1689(b)(2) ("A party to a contract may rescind the contract ... [i]f the consideration for the obligation of the rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds"). "A material breach is one that `is so dominant or pervasive as in any real or substantial measure to frustrate the purpose of the undertaking.'" Fantasy, 984 F.2d at 1530 (quoting Medico-Dental Bldg. Co. v. Horton & Converse, 21 Cal.2d 411, 132 P.2d 457 (1942)).
[2] The Merrick case, as published in California Reporter, is styled Writers Guild of America, West, Inc. v. Merrick.